**James McCoy (Yazoo) SMITH**

v.

**PRO FOOTBALL, INC., a Maryland Corporation, a/k/a Washington Redskins and the National Football League, Appellants (two cases).**

Nos. 76–2135, 76–2136.

United States Court of Appeals, District of Columbia Circuit.

Argued 7 Dec. 1977.

Decided 9 Nov. 1978.

As Amended Nov. 22, 1978.

As Amended Jan. 31, 1979.

Rehearing Denied Feb. 1, 1979.

James C. McKay, Paul J. Tagliabue, and C. Michael Buxton, Washington, D. C., on the brief for the National Football League.

Bernard I. Nordlinger and Robert B. Frank, Washington, D. C., were on the brief for Pro-Football, Inc.

Stuart H. Johnson, Jr., Washington, D. C., with whom R. Kenneth Mundy and Mozart G. Ratner, Washington, D. C., were on the brief, for James M. (Yazoo) Smith.

Before McGOWAN, MacKINNON and WILKEY, Circuit Judges.

Opinion for the Court filed by WILKEY, Circuit Judge.

Opinion filed by MacKINNON, Circuit Judge, concurring in part and dissenting in part.

WILKEY, Circuit Judge:

█ This private antitrust action challenges the legality of the National Football League (NFL) player selection system, commonly called the "draft." The plaintiff is James McCoy (Yazoo) Smith, a former professional football player who played one season for the Washington Redskins after being drafted by them in 1968. The defendants are Pro-Football, Inc., which operates the Redskins, and the NFL. Smith contends that the draft as it existed in 1968 was an unreasonable restraint of trade in violation of §§ 1 and 3 of the Sherman Act,[1] and that, but for the draft, he would have

---

1. Sherman Act § 1, 15 U.S.C. § 1 (1976) provides in pertinent part:

    Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .

Sherman Act § 3, 15 U.S.C. § 3 (1976) provides in pertinent part:

    Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in any Territory of the United States or of the District of Columbia . . . or between any such Territory or Territories and any State or States or the District of Columbia, or with foreign nations, or between the District of Columbia and any State or States or foreign nations, is declared illegal.

Smith's complaint also alleged a violation of Sherman Act § 2, which forbids monopolization and attempts or conspiracies to monopolize.

negotiated a far more lucrative contract when he signed as a player in that year. Smith alleges that he has been injured in his business or property[2] in the amount of the difference between the compensation he actually received and the compensation he would have received had there existed a "free market" for his services.

After a trial to the court, District Judge Bryant held that the NFL draft as it existed in 1968 constituted a "group boycott" and was thus a *per se* violation of the Sherman Act.[3] Alternatively, he held that the draft, tested under the rule of reason, was an unreasonable restraint because it was "significantly more restrictive than necessary" to accomplish whatever legitimate goals the NFL had.[4] Judge Bryant awarded Smith treble damages totaling $276,000. The Redskins and the NFL have appealed the finding of antitrust liability; both sides have appealed the damage award. Relying on the rule of reason, we affirm the finding of antitrust liability and remand for recomputation of damages.

## I. BACKGROUND

The NFL draft, which has been in effect since 1935, is a procedure under which nego-tiating rights to graduating college football players are allocated each year among the NFL clubs in inverse order of the clubs' standing. Under the draft procedures generally followed, the team with the poorest playing-field record during the preceding season has the first opportunity, as among the NFL teams, to select a college player of its choice; the team with the next poorest record has the next choice, and so on until the team with the best record (the winner of the previous year's "Super Bowl") has picked last. At this point, the first "round" of the draft is completed. In 1968 there were 16 succeeding rounds in the yearly draft, the same order of selection being followed in each round. Teams had one choice per round unless they had traded their choice in that round to another team (a fairly common practice). When Smith was selected by the Redskins there were 26 teams choosing in the draft.

The NFL draft, like similar procedures in other professional sports, is designed to promote "competitive balance." By dispersing newly arriving player talent equally among all NFL teams, with preferences to the weaker clubs, the draft aims to produce

---

The monopolization issue was not discussed by the District Court, however, and none of the parties has raised it on appeal.

**2.** Section 4 of the Clayton Act confers the right to sue for treble damages on "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . ." 15 U.S.C. § 15 (1976). Defendants have conceded that the draft operates to depress the starting salary levels of "top college players," Brief of NFL at 7, a class that evidently includes plaintiff, who was the twelfth player in the nation to be drafted in 1968. Defendants nevertheless suggest that plaintiff lacks standing to sue, arguing that any short-run pecuniary loss he may have suffered is more than offset by the long-run benefits—financial and otherwise—that accrue to players from the draft. Brief of Pro-Football, Inc., at 29–44. Putting to one side the consideration that plaintiff, whose football career was terminated by an injury in his first year, was not around to reap this rich harvest of benefits, defendant's theory that § 4 incorporates a "net loss" provision is frivolous, and we reject it. Whatever relevance "offsetting benefits" may have to the determination of the reasonableness of a restraint at the *merits* stage, they are utterly irrelevant to a determination of "injury-in-fact" at the *standing* stage.

Outside the context of professional sports, courts have regularly denied employees standing to sue for antitrust injuries to their employer, generally on the ground that any injury to the employee is "indirect." *See* Berger & Bernstein, *An Analytical Framework for Antitrust Standing*, 86 Yale L.J. 809, 821–23 (1977). Yet the courts have invariably found that athletes have standing to challenge player restrictions in professional sports, since these restraints operate directly on, and to the detriment of, the employee. *See generally Robertson v. National Basketball Ass'n*, 389 F.Supp. 867, 883–84 (S.D. N.Y.1975) (citing cases).

**3.** Judge Bryant's opinion is reported at 420 F.Supp. 738 (D.D.C.1976). Since that time the Supreme Court has decided *National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), and *St. Paul Fire & Marine Ins. Co. v. Barry*, —— U.S. ——, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978), from whose guidance we have benefitted, a privilege denied to Judge Bryant.

**4.** 420 F.Supp. at 746.

teams that are as evenly-matched on the playing field as possible. Evenly-matched teams make for closer games, tighter pennant races, and better player morale, thus maximizing fan interest, broadcast revenues, and overall health of the sport.

The draft is effectuated through the NFL's "no-tampering" rule.[5] Under this rule as it existed in 1968, no team was permitted to negotiate prior to the draft with any player eligible to be drafted, and no team could negotiate with (or sign) any player selected by another team in the draft. The net result of these restrictions was that the right to negotiate with any given player was exclusively held by one team at any given time. If a college player could not reach a satisfactory agreement with the team holding the rights to his services he could not play in the NFL.[6]

Plaintiff Smith became subject to the draft when he graduated as an All-American football player from the University of Oregon in 1968. The Redskins, choosing twelfth, picked Smith as their first-round draft choice. After several months of negotiations, in which he was represented by an agent, Smith and the Redskins signed a one-year contract—a version of the Standard Player Contract that the NFL requires all players to sign.[7] The contract awarded Smith a $23,000 "bonus" for signing, an additional $5,000 if he made the team, and a salary of $22,000, for a total first-year compensation of $50,000.

Smith made the team and performed at a high level of play as a defensive back until he suffered a serious neck injury in the final game of the 1968 season. His doctors advised him not to continue his football career. After his injury the Redskins paid

5. NFL Constitution & By-Laws, Art. 10.2, 12.-1(F) & (G) (1968), *reprinted in* Joint Appendix (J.A.) at 212, 214.

6. The draft and its attendant restrictions govern the *entry* of college players ("rookies") into the NFL. A distinct set of restraints inhibits the *mobility* of players once they have signed with an NFL club. The Standard Player Contract as it existed in 1968 contained an "option" clause which gave a club, in the event that it and a player could not come to contract terms, the right unilaterally to renew the player's contract for a second year at 90% of his previous year's salary. If a player, despite the obvious financial disincentive, elected to "play out his option," he became a "free agent" at the end of his second year and technically was free to negotiate with any other team. At this point, however, a player's "freedom" was considerably restricted by the "Rozelle rule," NFL Constitution & By-Laws, Art. 12.1(H) (1968), *reprinted in* J.A. at 214–15. This rule essentially required the signing club to compensate the player's former team; if the two clubs were unable to conclude mutually satisfactory arrangements, the Commissioner could award compensation in the form of current players, future draft choices, or both, as he in his sole discretion deemed "fair and equitable." The Rozelle rule restrained player mobility because of its *in terrorem* effect on the prospective signing team: teams were reluctant to risk losing key players and valuable draft choices at the Commissioner's disposition, and thus were reluctant to sign a "free agent" unless they had succeeded in reaching an agreement with the player's former team—an agreement which the former team, if it were recalcitrant, could pre-

clude. These restraints, upon which we express no views here, are discussed in *Mackey v. NFL*, 543 F.2d 606 (8th Cir. 1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977); *Kapp v. NFL*, 390 F.Supp. 73 (N.D.Cal. 1974), *aff'd in part and appeal dismissed in part as moot*, 586 F.2d 644 (9th Cir. 1978).

In February 1977 the NFL clubowners and Players Association agreed to a new 5-year contract that works significant changes in the draft, Rozelle rule, option clause, and Standard Player Contract. *See* N.Y. Times, 18 Feb. 1977, at 21, col. 2; *id.*, 26 Feb. 1977, at 15, col. 4. The modified draft is far less restrictive than the one described in the text; it continues for fewer rounds (thus applying to fewer players), eliminates the selecting team's "perpetual" right of negotiation with its players, facilitates players' becoming "free agents," and establishes minimum salary levels for "rookies." Relaxations are also introduced into the Rozelle rule (limiting it to "upper salary level" players), the option clause (making the option year salary 110% of the previous year's and eliminating option clause after four seasons), and the Standard Player Contract (providing certain injury-protection guarantees). These modifications were noted favorably by the District Court in approving a settlement of the *Mackey* case. *See Alexander v. NFL*, No. 4–76–Civil 123 (D.Minn. 29 July 1977), slip op. at 26–28. We express no views on the legality of the modified NFL player draft, confining our attention to the draft as it existed in 1968.

7. NFL Constitution & By-Laws, Art. 15.1 (1968), *reprinted in* J.A. at 216–17.

Smith an additional $19,800, representing the amount he would ordinarily have received had he played out the second ("option") year of his contract.[8]

Two years after his injury Smith filed suit in the District Court. After finding that the draft violated the antitrust laws, Judge Bryant awarded Smith damages equal to the difference between his actual compensation and the compensation he could have received in a free market. To compute the latter amount, Judge Bryant assumed that plaintiff in a free market would have been able to negotiate a three-year contract with an "injury protection clause," i. e., a clause guaranteeing payment for the full term of a player's contract even if he should be incapacitated. Judge Bryant estimated Smith's annual "free market salary" by taking the annual salary ($54,000) of another defensive back (Pat Fischer) who signed as a "free agent"[9] with the Redskins in 1968. The resulting calculation yielded $162,000 as the contractual value of Smith's services in a free market. From this sum Judge Bryant subtracted the $69,800 that Smith in fact received, netting

actual damages in the amount of $92,200. This figure was trebled to $276,600 in accordance with the antitrust laws.[10]

## II. ANALYSIS

The legality of the NFL player draft under the antitrust laws[11] is essentially a question of first impression.[12] This case requires us to consider (1) whether the legality of the draft is governed by a *per se* rule or by the rule of reason; (2) whether the draft, if tested by the rule of reason, is a reasonable restraint; and (3) whether, if the draft violates the antitrust laws, the measure of damages adopted by the District Judge was proper. We discuss these issues in turn.

### A. *Per Se Illegality*

The traditional framework of analysis under § 1 of the Sherman Act is familiar and does not require extended discussion. Section 1 prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce." While this language is broad enough to render illegal nearly all commercial understandings, the

---

8. *See* note 6 *supra.*

9. *See* note 6 *supra.*

10. Clayton Act § 4, 15 U.S.C. § 15 (1976).

11. Professional football, like all professional sports excepting baseball, is subject to the antitrust laws. *Compare Radovich v. NFL*, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957) *with Flood v. Kuhn*, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972). Restrictive agreements between the NFL and its Players Association, like collective bargaining contracts in other industries, may in proper circumstances be shielded from antitrust scrutiny under the "labor law exemption." *See, e. g., United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Local 189, Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.E.2d 640 (1965). The District Court found the labor law exemption inapplicable to the NFL draft on the facts of this case, 420 F.Supp. at 741–44, and defendants have not appealed this ruling. *See* Brief of NFL at 26.

12. The Court of Appeals in *Mackey v. NFL*, 543 F.2d 606 (8th Cir. 1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977), held that the Rozelle rule violated the antitrust laws.

The District Court in *Kapp v. NFL*, 390 F.Supp. 73 (N.D.Cal.1974), *aff'd in part and appeal dismissed in part as moot*, 586 F.2d 644 (9th Cir. 1978), held that the Rozelle rule, the "no-tampering" rule, and the player draft unreasonably restrain trade. The legality of analogous player restraints in other professional sports has been discussed in several district court opinions; most of these decisions, rendered on motions for preliminary injunctions, are inconclusive. *See, e. g., Robertson v. National Basketball Ass'n*, 389 F.Supp. 867, 893–96 & 67 F.R.D. 691, 693–94 (S.D.N.Y.1975) (suggesting in dictum that NBA player draft and reserve clause may violate antitrust laws); *Denver Rockets v. All-Pro Management, Inc.*, 325 F.Supp. 1049, 1056–58 (C.D.Cal.1971) (granting preliminary injunction), *injunction reinstated sub nom. Haywood v. National Basketball Ass'n*, 401 U.S. 1204, 91 S.Ct. 672, 28 L.Ed.2d 206 (Douglas, J., in chambers, 1971) (same); *Philadelphia World Hockey Club v. Philadelphia Hockey Club*, 351 F.Supp. 462, 486, 503–04 (E.D.Pa. 1972) (denying preliminary injunction on *per se* theory but suggesting that NHL reserve clause may violate rule of reason); *Boston Prof. Hockey Ass'n v. Cheevers*, 348 F.Supp. 261 (D.Mass.), *remanded*, 472 F.2d 127 (1st Cir. 1972).

Supreme Court in *Standard Oil*[13] established a judicial gloss on the statute which made the "rule of reason" the prevailing mode of analysis. Under this rule, the factfinder weighs all the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an *unreasonable* restraint on competition. The inquiry mandated by the rule of reason, however, is often laborious, and as the courts gained experience with antitrust problems they identified certain types of agreements which were so consistently unreasonable that they could be deemed illegal *per se*, without elaborate inquiry into their purported justifications. Among the practices that have been deemed so pernicious as to be unreasonable *per se* are certain "group boycotts."[14]

Plaintiff argues that the NFL draft constitutes a "group boycott" because the NFL clubs concertedly refuse to deal with any player before he has been drafted or after he has been drafted by another team, and that the draft is in consequence a *per se* violation of § 1. The District Court accepted this argument. We reject it. We hold that the NFL player draft is not properly characterized as a "group boycott"—at least not the type of boycott that traditionally

has been held illegal *per se*—and that the draft, regardless of how it is characterized, should more appropriately be tested under the rule of reason.

The classic "group boycott" is a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level.[15] Typically, the boycotting group combines to deprive would-be competitors of a trade relationship which they need in order to enter (or survive in) the level wherein the group operates. The group may accomplish its exclusionary purpose by inducing suppliers not to sell to potential competitors, by inducing customers not to buy from them, or, in some cases, by refusing to deal with would-be competitors themselves.[16] In each instance, however, the hallmark of the "group boycott" is the effort of competitors to "barricade themselves from competition at their own level."[17] It is this purpose to exclude competition that has characterized the Supreme Court's decisions invoking the group boycott *per se* rule.[18]

The NFL player draft differs from the classic group boycott in two significant respects. First, the NFL clubs which have

---

**13.** *Standard Oil of N. J. v. U. S.*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

**14.** *E. g., United States v. General Motors Corp.*, 384 U.S. 127, 145–46, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212–13, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators' Guild v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

**15.** L. A. Sullivan, Antitrust 230, 232, 244 (1977).

**16.** *Id.* at 230. The third type of boycott is comparatively rare: it can be effective only where it is necessary for firms at the boycotting level to deal with one another in order to carry on their business, as is true, for example, in the case of brokers. *See Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

**17.** L. A. Sullivan, *supra* note 15 at 245.

**18.** *E. g., United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) (invoking boycott *per se* rule where re-

tailers induced manufacturers not to sell to competing retailers); *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (invoking boycott *per se* rule where retailer induced manufacturers and distributors not to sell to competing retailer); *Fashion Originators' Guild v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (invoking boycott *per se* rule where manufacturers induced retailers not to buy from competing manufacturers). *See Worthen Bank & Trust Co. v. National BankAmericard, Inc.*, 485 F.2d 119, 124–25 (8th Cir. 1973), *cert. denied*, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974) ("group boycott" label, with consequent finding of *per se* illegality, properly restricted to (1) horizontal combinations to exclude competitors; (2) vertical combinations to exclude competitors; (3) combinations designed to influence trade practices of boycott victims); *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Comm.*, 467 F.2d 178, 186–87 (5th Cir. 1972), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973) (same); Note, 9 Conn.L. Rev. 336, 340 (1977); Note, 55 Nebr.L.Rev. 335, 344 (1976).

"combined" to implement the draft are not *competitors* in any economic sense. The clubs operate basically as a joint venture [19] in producing an entertainment product—football games and telecasts. No NFL club can produce this product without agreements and joint action with every other team. To this end, the League not only determines franchise locations, playing schedules, and broadcast terms, but also ensures that the clubs receive equal shares of telecast and ticket revenues. These economic joint venturers "compete" on the playing field, to be sure, but here as well cooperation is essential if the entertainment product is to attain a high quality: only if the teams are "competitively balanced" will spectator interest be maintained at a high pitch. No NFL team, in short, is interested in driving another team out of business, whether in the counting-house or on the football field, for if the League fails, no one team can survive.

The draft differs from the classic group boycott, secondly, in that the NFL clubs have not combined *to exclude competitors or potential competitors* from their level of the market.[20] Smith was never seeking to "compete" with the NFL clubs, and their refusal to deal with him has resulted in no decrease in the competition for providing football entertainment to the public. The draft, indeed, is designed not to insulate the NFL from competition, but to improve the entertainment product by enhancing its teams' competitive equality.[21]

In view of these differences, we conclude that the NFL player draft cannot properly be described as a group boycott—at least not the type of group boycott that traditionally has elicited invocation of a *per se* rule.[22] The "group boycott" designation,

19. *See, e. g., Mackey v. NFL*, 543 F.2d 606, 619 (8th Cir. 1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977) (noting "joint venture" characteristics of NFL); L. A. Sullivan, *supra* note 15, at 251–52 (same); Note, *The Super Bowl and the Sherman Act: Professional Team Sports and the Anti-trust Laws,* 81 Harv.L.Rev. 418, 419–21 (1967); *Cf. Levin v. National Basketball Ass'n*, 385 F.Supp. 149, 152 (S.D.N.Y.1974) (noting "joint venture" characteristics of NBA); *San Francisco Seals v. National Hockey League*, 379 F.Supp. 966, 969 (C.D.Cal.1974) (noting "joint venture" characteristics of NHL).

20. *See* Note, 55 Nebr.L.Rev. 335, 344 (1976).

21. *Cf. Deesen v. Professional Golfers' Ass'n*, 358 F.2d 165, 170 (9th Cir.), *cert. denied*, 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (1966) (refusing to invoke boycott *per se* rule against tournament entry restrictions where purpose was "not to destroy competition but to foster it by maintaining a high quality of competition").

22. The term "group boycott," as the Eighth Circuit has noted, can be used as "a very broad label for divergent types of concerted activity," *Worthen Bank & Trust Co. v. National Bank-Americard, Inc.,* 485 F.2d 119, 125 (8th Cir. 1973), *cert. denied*, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974), and there is in consequence "more confusion about the scope and operation of the *per se* rule against group boycotts than in reference to any other aspect of the *per se* doctrine." L. A. Sullivan, *supra* note 15 at 229–30. When confronted with concerted refusals to deal that do not fit the classic "group boycott" pattern, the courts almost without exception have held the *per se* rule inapplicable. In reaching this conclusion, however, they have vacillated between two divergent paths. Some courts have adhered to the traditional canon that all group boycotts are illegal *per se*, and concluded that the concerted activity at issue was not a group boycott. *See, e. g., Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71, 76–79 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). Other courts have held that the concerted activity at issue was a group boycott, but that there were two types of group boycotts—"*per se* boycotts" and "rule of reason boycotts"—and that the concerted activity at issue fell into the second category. *See, e. g.,* 11 Von Kalinowski, Antitrust Laws and Trade Regulation § 76.02 at 76–11 (1978) (citing cases). Although these divergent paths presumably will lead in most cases to the same destination, their coexistence has not encouraged clarity or consistency of analysis.

The Supreme Court shed some light on this problem in *St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978). In that case, the Court held that the refusal by a group of insurance companies to deal on any terms with certain policyholders was a "boycott" within the meaning of § 3(b) of the McCarran-Ferguson Act, 15 U.S.C. § 1013(b) (1976). Noting that its own previous decisions "reflect[ed] a marked lack of uniformity in defining the term," the Court decided that "boycott" should be given the broad meaning familiar from labor law and rejected defendants' attempt to define it as "embracing

we believe, is properly restricted to concerted attempts by competitors to exclude horizontal competitors; it should not be applied, and has never been applied by the Supreme Court, to concerted refusals that are not designed to drive out competitors but to achieve some other goal.[23]

We are guided in reaching this conclusion by decisions in analogous areas of antitrust law. The courts have consistently refused to invoke the boycott *per se* rule where, given the peculiar characteristics of an industry, the need for cooperation among participants necessitated some type of concerted refusal to deal,[24] or where the concerted activity manifested no purpose to exclude and in fact worked no exclusion of competitors.[25] In view of the joint-venture charac-

only those combinations which target *competitors* of the boycotters as the ultimate objects of a concerted refusal to deal." 438 U.S. at 542, 98 S.Ct. at 2930 (emphasis original). Although the Court did not delimit "the precise reach" of the term, *id.* at 545 n.18, 98 S.Ct. at 2932 n.18, it held that a "boycott" was at least broad enough to include the practice involved in that case, namely, an agreement by which one company "induced its competitors to refuse to deal on any terms with its customers." *Id.* at 544, 98 S.Ct. at 2931.

Given the Court's broad definition of "boycott" in *St. Paul Fire & Marine*, we assume for purposes of this decision that the NFL draft could be described as a "boycott"—although as we noted above, the draft, unlike the agreement in that case, is not strictly an agreement *among competitors. See* pp. —— —— of 193 U.S.App.D.C., pp. 1178–1179 of 593 F.2d *supra.* To describe the draft as a boycott, however, is not to end our inquiry. The Court noted in *St. Paul Fire & Marine* that " 'boycotts are not a unitary phenomenon,' " *id.* at 543, 98 S.Ct. at 2931, *quoting* P. Areeda, Antitrust Analysis 381 (1974), and stated that the issue before it was only "whether the conduct in question involves a boycott, not whether it is *per se* unreasonable." 438 U.S. at 542, 98 S.Ct. at 2930. In rejecting defendants' argument that a boycott should be defined as "limited to concerted activity . . . against competitors of members of the boycotting group," *id.* at 552, 98 S.Ct. at 2935, the Court expressed no view as to whether "a *per se* offense in this area" should be so defined. *Id.* at 542 & n.14, 98 S.Ct. at 2930 & n.14. Although the Court has clarified boycott analysis by suggesting that judicial investigations should pursue the second path described above, it left open the question that confronts us here: whether boycotts not designed to exclude competitors are illegal *per se.*

23. L. A. Sullivan, *supra* note 15 at 232. See *id.* at 231–32:

Suppose . . . that a group of professional football teams agreed not to hire any player found to have gambled on games. This is a concerted refusal to deal. But, whatever the purposes and effects may be thought to be, it is a concerted arrangement very different from the typical boycott. It does not constitute concerted action by com-

peting firms at one level to exclude other would-be competitors. It ought, then, not to be analyzed under a generic rule which deals with concerted efforts by traders at a given level to insulate themselves from other competition.

*Cf. Molinas v. National Basketball Ass'n,* 190 F.Supp. 241 (S.D.N.Y.1961) (boycott *per se* rule inapplicable to NBA suspension of player for placing bets in league games).

24. *See Hatley v. American Quarter Horse Ass'n,* 552 F.2d 646, 652–53 (5th Cir. 1977) (finding no *per se* illegal group boycott in association's refusal to register plaintiff's horse, in accordance with its regulation: "[i]n an industry which necessarily requires some interdependence and cooperation, the *per se* rule should not be applied indiscriminately"); *Worthen Bank & Trust Co. v. National Bank-Americard, Inc.,* 485 F.2d 119, 126, 127, 128 n.7 (8th Cir. 1973), *cert. denied,* 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974) (refusing to invoke boycott *per se* rule where "product" represented by bank credit card "requires cooperative relationships among . . . member banks" and it would be impossible for any bank to issue such card on its own).

25. *See, e. g., E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Comm.,* 467 F.2d 178, 187–88 (5th Cir. 1972), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973) (finding no *per se* illegal group boycott in airlines' refusal to list tour operator where tour operator was not competitor of airlines and there was no intent to exclude him from market); *Bridge Corp. of America v. American Contract Bridge League,* 428 F.2d 1365, 1370–71 (9th Cir. 1970), *cert. denied,* 401 U.S. 940, 91 S.Ct. 940, 28 L.Ed.2d 220 (1971) (finding no *per se* illegal group boycott in ACBL's refusal to sanction local tournament where there was no purpose to exclude competition); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71, 76–79 (9th Cir. 1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970) (finding no *per se* illegal group boycott where distillers' agreement to terminate distributor manifested no anticompetitive intent); *Jones v. NCAA,* 392 F.Supp. 295, 304 (D.Mass.1975) (finding no *per se* illegal group boycott in NCAA eligibility rule);

teristics of the professional football industry and the *purpose of the concerted activity* here, these decisions support our conclusion that the NFL player draft is not a group boycott which is illegal *per se.*

Whether the draft is a group boycott, or not, we think it is clearly not the type of restraint to which a *per se* rule is meant to apply. A *per se* rule is a judicial shortcut; it represents the considered judgment of courts, after considerable experience with a particular type of restraint, that the rule of reason—the normal mode of analysis—can be dispensed with. As the Supreme Court explained in *Northern Pacific Railway Co. v. United States,*[26] "there are certain agreements or practices which because of their *pernicious effect on competition and lack of any redeeming virtue* are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." A court will not indulge in this conclusive presumption lightly. Invocation of a *per se* rule always risks sweeping reasonable, pro-competitive activity within a general condemnation, and a court will run this risk only when it can say, on the strength of unambiguous experience,[27] that the challenged action is a "naked restraint[ ] of trade with no purpose except stifling of competition."[28]

The Supreme Court emphasized the "demanding standards" of *Northern Pacific Railway* last Term in *Continental T. V., Inc. v. GTE Sylvania Inc.*[29] Reiterating that "[p]er se rules of illegality are appropriate only when they relate to conduct that is *manifestly anti-competitive,*"[30] the Court overruled *Arnold, Schwinn & Co.*[31] which had held certain vertical restraints illegal *per se.* The *Continental* Court noted that the vertical restrictions in question possessed "redeeming virtues" in their stimulation of inter-brand competition; that the restrictions were "widely used in our free market economy"; and that there existed "substantial scholarly and judicial authority supporting their economic utility."[32] For these reasons, the Court held that the restraints at issue were to be analyzed not under a *per se* rule, but under the rule of reason.

For similar reasons we reach the same conclusion here. The NFL player draft, we think, quite clearly fails to satisfy the "demanding standards" of *Northern Pacific Railway.* Given that the draft's restrictive effect is temporally limited, we would hesitate to describe its impact on the market for players' services as "pernicious." More importantly, we cannot say that the draft has "no purpose except stifling of competition" or that it is without "any redeeming virtue." Some form of player selection system may serve to regulate and thereby promote competition in what would otherwise be a chaotic bidding market for the services of college players. The Redskins, moreover, presented considerable evidence at trial that the draft was designed to preserve, and that it made some contribution to preserving, playing-field equality among the NFL-teams with various attendant benefits. The draft, finally, like the vertical restraints challenged in *Continental T.V.,* is

*College Athletic Placement Serv., Inc. v. NCAA,* 1975–1 Trade Cas. ¶ 60,117 (D.N.J.), *aff'd without opinion,* 506 F.2d 1050 (3d Cir. 1974) (same).

**26.** 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (emphasis added).

**27.** *See White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); *Evans v. S. S. Kresge Co.,* 544 F.2d 1184, 1191 (3d Cir. 1976).

**28.** *White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738

(1963), *quoted in United States v. Topco Associates, Inc.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

**29.** 433 U.S. 36, 50, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), *quoting* 356 U.S. at 5, 78 S.Ct. 514.

**30.** *Id.* at 49–50, 97 S.Ct. at 2558 (emphasis added).

**31.** *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

**32.** 433 U.S. at 57–58, 97 S.Ct. at 2562.

"widely used" in our economy [33] and has both judicial [34] and scholarly [35] support for its economic usefulness.

This is not to say, of course, that the draft in any one of its incarnations may not violate the antitrust laws. It is only to say that the courts have had too little experience with this type of restraint, and know too little of the "economic and business stuff" from which it issues,[36] confidently to declare it illegal without undertaking the analysis enjoined by the rule of reason.

Our conclusion that the legality of the NFL draft should not be governed by a *per se* rule parallels the conclusion of most courts [37] and commentators [38] that the legality of player restrictions in professional sports should be governed by the rule of reason. In the case most nearly on point, the Eighth Circuit recently declined, for reasons akin to ours, to apply a *per se* approach to the NFL's Rozelle rule.[39] While we fully appreciate the administrative convenience of a *per se* rubric, ease of application alone cannot suffice to recommend it.[40] In antitrust law, as elsewhere, we must heed Justice Cardozo's warning to beware "the tyranny of tags and tickets." [41] When anticompetitive effects are shown to result from a particular player selection system "they can be adequately policed under the rule of reason." [42]

---

**33.** Some form of player selection system, or "draft," is used in each of the major professional sports (*i. e.*, the sports that have amassed the greatest spectator following through nationwide television broadcasts). The draft has been employed in professional football since 1935. A draft is used in professional basketball (*see, e. g., Robertson v. NBA*, 389 F.Supp. 867, 874, 891–93 (S.D.N.Y.1975)) and in professional hockey (*see, e. g., Philadelphia World Hockey Club v. Philadelphia Hockey Club*, 351 F.Supp. 462, 477–78 (E.D.Pa.1972)). After many years of exclusive reliance on its "farm system," professional baseball adopted a draft in 1965 because the farm system was leading to competitive imbalance. *See* Note, *supra* note 19 at 422–23.

**34.** *See Robertson v. NBA*, 389 F.Supp. 867, 892 (S.D.N.Y.1975), and cases cited in note 37 *infra*.

**35.** *See* Note, *supra* note 19 at 419–22, and authorities cited in note 38 *infra*.

**36.** *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963).

**37.** *See Mackey v. NFL*, 543 F.2d 606, 618–20 (8th Cir. 1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977) (*per se* rule inapplicable to NFL Rozelle rule); *Deesen v. Professional Golfers' Ass'n*, 358 F.2d 165 (9th Cir.), *cert. denied*, 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (1966) (rule of reason applicable to PGA tournament entry restrictions); *Kapp v. NFL*, 390 F.Supp. 73, 81 (N.D.Cal.1974) (*per se* rule inapplicable to NFL draft and Rozelle rule), *aff'd in part and appeal dismissed in part as moot*, 586 F.2d 644 (9th Cir. 1978); *Philadelphia World Hockey Club v. Philadelphia Hockey Club*, 351 F.Supp. 462, 503 (E.D.Pa.1972) (*per se* rule inapplicable to NHL reserve clause); *Flood v. Kuhn*, 316 F.Supp. 271, 275–78 (S.D.N.Y.1970), *aff'd on other grounds*, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972) (*per se* rule inapplicable to professional baseball reserve system) (dictum). *Cf. Hatley v. American Quarter Horse Ass'n*, 552 F.2d 646, 652–53 (5th Cir. 1977) (*per se* rule inapplicable to racing association registration rule); *Bridge Corp. of America v. American Contract Bridge League*, 428 F.2d 1365, 1369 (9th Cir. 1970), *cert. denied*, 401 U.S. 940, 91 S.Ct. 940, 28 L.Ed.2d 220 (1971) (*per se* rule inapplicable to ACBL refusal to sanction local tournament); *College Athletic Placement Serv., Inc. v. NCAA*, 1975–1 Trade Cas. ¶ 60,117 (D.N.J.), *aff'd without opinion*, 506 F.2d 1050 (3d Cir. 1974) (*per se* rule inapplicable to NCAA player eligibility rule).

**38.** *See* L. A. Sullivan, *supra* note 15, at 231–32, 255 n.5; Note, 41 Albany L.Rev. 154, 159–60 (1977); Note, 9 Conn.L.Rev. 336, 342 (1977); Note, 55 Nebr.L.Rev. 335, 344–47 (1976); Note, 59 Marq.L.Rev. 632, 638 (1976); Note, *The Legality of the Rozelle Rule and Related Practices in the National Football League*, 4 Ford.Urb. L.J. 581, 586–88 (1976); Note, *Player Control Mechanisms in Professional Sports*, 34 U.Pitt.L. Rev. 645, 651–53 (1973).

**39.** *Mackey v. NFL*, 543 F.2d 606, 618–20 (8th Cir. 1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). *See* note 6 *supra*.

**40.** *See Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 50 n.16, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Hatley v. American Quarter Horse Ass'n*, 552 F.2d 646, 653 (5th Cir. 1977).

**41.** Cardozo, *Mr. Justice Holmes*, 44 Harv.L. Rev. 682, 688 (1931).

**42.** *Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 59, 97 S.Ct. 2549, 2563, 53 L.Ed.2d 568 (1977).

## B. *Rule of Reason*

██ Under the rule of reason, a restraint must be evaluated to determine whether it is significantly anticompetitive in purpose or effect. In making this evaluation, a court generally will be required to analyze "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." [43] If, on analysis, the restraint is found to have legitimate business purposes whose realization serves to promote competition, the "anticompetitive evils" of the challenged practice must be carefully balanced against its "procompetitive virtues" to ascertain whether the former outweigh the latter.[44] A restraint is unreasonable if it has the "net effect" of substantially impeding competition.[45]

██ After undertaking the analysis mandated by the rule of reason, the District Court concluded that the NFL draft as it existed in 1968 had a severely anticompetitive impact on the market for players' services, and that it went beyond the level of restraint reasonably necessary to accomplish whatever legitimate business purposes might be asserted for it. We have no basis for disturbing the District Court's findings of fact;[46] and while our legal analysis dif-

**43.** *National Society of Professional Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978).

**44.** Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977*, 77 Colum.L.Rev. 979, 983 (1977). *See Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977), *citing Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918) (under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition"). *Cf. id.* at 50 n.16, 97 S.Ct. at 2558 (in determining whether a particular commercial practice should be prohibited *per se*, "[t]he probability that anticompetitive consequences will result from [the] practice and the severity of those consequences must be balanced against its pro-competitive consequences").

**45.** L. A. Sullivan, *supra* note 15 at 187, 188. *See National Society of Professional Engineers v. United States*, 435 U.S. at 691, 98 S.Ct. at 1365, *quoting Chicago Bd. of Trade v. United States*, 246 U.S. at 238, 38 S.Ct. at 244, ("The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.")

**46.** The bulk of our colleague's dissent is devoted to a recitation and analysis of detailed facts relating to the history of professional football, some in the record before the district court and some supplemental thereto. See note 49 *infra*. Our colleague then makes his own findings of fact as to the benefits derived in 1968 and currently from the professional football draft, and its effect on competition, these findings of fact differing from those of the trial court. For example, "[s]ome argue that this [competitive balance] has been caused by other factors, but the preponderance of the *factual* testimony and record evidence supports a conclusion that the college player draft was the key factor which produced the competitive balance of the teams . . . . . There was no showing to the contrary in the 2,000 page record." Dis. op. at ——, —— of 193 U.S.App.D.C., at ——, 1198–1199 of 593 F.2d.

First, we believe that the NFL's theory of competitive balance, even were it empirically valid, is legally wide of the mark in a rule of reason inquiry, *see* pp. ——–—— of 193 U.S. App.D.C. 1185–1189 of 593 F.2d, *infra*. Moreover, there *was* a showing in the record which contradicts the findings of the dissent as our colleague himself realizes: "The court concluded that the evidence on whether the draft was essential to competitive balance was 'at best equivocal,' and that no correlation was demonstrated between the draft and survival of the League." Dis. op. at —— of 193 U.S.App.D.C., at 1211 of 593 F.2d.

We suggest this finding of fact by the trial court, as recited by our colleague, must be affirmed if there is evidence in the record to support it, and that an appellate court cannot make a different finding of fact, particularly when the record evidence obviously lends itself to the conclusion reached by the trial court. *See Daniels v. Hadley Memorial Hospital*, 185 U.S. App.D.C. 84, 91, 566 F.2d 749, 756 (1977).

First, to the extent the defendant's theory relies on the draft as a device to allocate player talent evenly, without which wealthy owners would be free to corner the market, Judge Bryant found "abundant convincing testimony" that factors other than money are often decisive in players' choice of teams. 420 F.Supp. at 746. *See J.A.* at 945 (unrelated business opportunities); *id.* at 1049–52 (same); *id.* 1073–74 (racial discrimination and general community atmosphere); *id.* at 1080–84 (preference for NFL over AFL); *id.* at 1086, 1091–92 (dispute with owner); *id.* at 1112 (climate); *id.* at 1212 (educational opportunities); *id.* at

fers slightly from that of the trial judge, having benefited from intervening guidance

1214–15 (disagreement with coaching staff and management). Further, the evidence with regard to the movement of free agents and former World Football League players who were ungoverned by the draft did not reveal any trend for the best players to become concentrated with teams "offering money, glamour and success." 420 F.Supp. at 746, *citing Free Agents' First Wave On the Move*, Washington Post, 7 July 1976, at D1.

Second, it is doubtful whether the draft was effective in maintaining whatever competitive balance did exist in the League. Although from year to year the worst teams usually got somewhat better and the best teams somewhat worse, it is uncertain how much, if any, of this is explained by the draft. *See* J.A. at 939–40, 990, 1975 (testimony of Dr. George Burman); *id.* at 1968–69 (testimony of Bruce Caputo).

Without by any means going into the minute detail furnished with such relish by our colleague, we think that two other factors contribute at least as much as the player draft to producing and maintaining a competitive balance in the league—*television* revenues and *coaching* changes.

The player draft originated in 1935 and was in full effect from then on, but none of the wonderful development of the professional football game pointed to by the appellant, and encored by our colleague, occurred until the mid-1950's. The advent of professional football on television created a synergistic effect between television and the sport. Television exposure brought more fans, produced more revenues, which in turn produced better paid players, more profitable franchises, and generally a better entertainment feature for television. This sort of ratchet effect started working in the mid-1950's with the advent of television and has continued over the years. *See Proceedings, Conference on the Economics of Professional Sports*, Washington, D.C., 7 May 1974, at 30, J.A. at 290.

It is possible to say that in the 1935–1955 period the player draft had some importance in preserving a kind of competitive balance, preventing rich owners from running away with the league (if there were any independently rich owners of the then only nine professional football teams). But by 1968, as now, the impact of the player draft is clearly different from what arguably it had been in 1935–1955.

The great equalizing feature now is not the player draft, but the league's arrangement to place the teams financially on nearly equal footing—equal sharing of television revenues. In 1968 each team in the NFL received nearly one third of its revenues from television and radio, averaging $1.13 million. *See* J.A. at 618. (In 1974, the most recent year for which figures appear in the record, such revenues averaged $2.28 million and were 34.5 percent of total

from the Supreme Court, we agree with the District Court's conclusion that the NFL

revenues. *Id.* at 655). We were told at oral argument by counsel for the NFL that such revenues now represent over half of average team income. If one realizes that at the present time all teams in the league will receive more than one half of their revenues in exactly equal shares from television, and nearly every team in the league is able to sell out its stadium for all the league games, then it appears that the financial sinews for a competitive player balance have been equalized. *See* J.A. at 1978 (testimony of Dr. George Burman).

The second factor producing competitive balance (or lack of it) is the impact of the *coach* on the success or failure of the team. Despite the claims to "competitive balance" from whatever factors, it is clear that a small number of the teams have dominated the play-offs year after year. The record shows nine teams as occupying twenty-two out of the available twenty-four places in the play-offs in the 1973–1975 seasons. *See* 420 F.Supp. at 746, *citing* N.Y. Times, 6 June 1976, at 56. These nine teams include teams with long records of success year after year with the same coach: (1) Dallas Cowboys with Landry; (2) Washington Redskins with Lombardi and Allen; (3) Minnesota Vikings with Grant; (4) Oakland Raiders with Madden; (5) Miami Dolphins with Shula; (6) Pittsburgh Steelers with Noll. These teams have consistently been in the play-offs and won titles, despite the fact that under the draft they have been getting the worst picks year after year. It would appear that the effects of fine coaching swamp whatever effect the draft may have on team performance.

Analysis of the record of coaching changes, or lack of changes, illustrates at least two things. First, that the player draft does not have an equalizing effect to the extent of knocking out the top teams, if the top teams have good coaches. Second, it is certainly arguable that what happens to change the position of teams in the league is not a draft choice advantage, but that the losing teams fire the losing coaches.

Our colleague argues "[i]n only one of twelve seasons from 1964–1975 did those teams in the bottom half of the NFL's standings fail to win a greater number of games in the next following priority selections in the draft. Statistical analysis shows that this could not have been the product of chance occurring without regard to the draft." (Dis. op. note 45). Our dissenting colleague did not tell us how many of the teams in the bottom half of the standings not only received the usual priority in draft selection, but also fired their losing coaches. Whatever statistical analysis our colleague is talking about, it is obviously worthless unless it takes account of the changes in the head coaches and the coaching staffs as well.

draft as it existed in 1968 constituted an unreasonable restraint of trade.

The draft that has been challenged here is undeniably anticompetitive both in its purpose and in its effect. The defendants have conceded that the draft "restricts competition among the NFL clubs for the services of graduating college players" and, indeed, that the draft "is designed to limit competition" and "to be a 'purposive' restraint" on the player-service market.[47] The fact that the draft assertedly was designed to promote the teams' playing-field equality rather than to inflate their profit margins may prevent the draft's purpose from being described, in subjective terms, as nefarious. But this fact does not pre-

vent its purpose from being described, in objective terms, as anticompetitive, for suppressing competition, is the *telos*, the very essence of the restraint.

The trial judge was likewise correct in finding that the draft was significantly anticompetitive in its *effect*. The draft inescapably forces each seller of football services to deal with one, and only one buyer, robbing the seller, as in any monopsonistic market, of any real bargaining power.[48] The draft, as the District Court found, "leaves no room whatever for competition among the teams for the services of college players, and utterly strips them of any measure of control over the marketing of their talents."[49] The predictable effect

---

The changes in position in the league effected by changes in head coaches is easily seen from the record by what happened after the arrival of Lombardi in Green Bay, the arrival of Lombardi and thereafter Allen at Washington, the move of Shula to the Miami Dolphins, and the move of Noll to the Pittsburgh Steelers. *See* J.A. at 658–76; *id.* at 950–52, 1978–79 (testimony of Dr. George Burman); *id.* at 904–05 (testimony of Edward Garvey); *id.* at 1116–18 (testimony of Bart Starr). In each of these four instances teams with a long series of losing seasons, during which they had had the benefit of priority in the player draft, were very shortly upgraded into title contenders after the arrival of these coaches of recognized high ability.

We think the trial court was eminently correct when he "concluded that the evidence on whether the draft was essential to competitive balance was 'at best equivocal,' and that no correlation was demonstrated between the draft and survival in the league."

**47.** Brief of NFL at 9.

**48.** *Defendants argue that college football players possess a significant amount of bargaining power, since they can refuse to sign with the team that drafted them, electing instead to sit out several seasons or to play for the Canadian Football League. The first alternative, however, necessitates both a considerable financial sacrifice and a potentially harmful interruption of a player's career. The second alternative is little better: the evidence established that the opportunities for American players in Canada are both limited (owing to a hiring preference for native players) and significantly less rewarding (lower salaries, fewer promotional opportunities, less "glamor"). The evidence plainly supported the District Court's finding that the availability of these alternatives failed to furnish a player with much, if any, bargaining power in salary discussions with the drafting club.*

**49.** 420 F.Supp. at 746. Our colleague has reinforced his own encyclopedic knowledge of football with repeated references to The NFL's Official Encyclopedia History of Professional Football (1977), beginning with note 3. Whatever may be the propriety of a trial court taking judicial notice of an "encyclopedia" to establish facts (and an encyclopedia whose occasional inaccuracy our colleague himself corrects, note 23), *see* McCormick's Handbook of the Law of Evidence §§ 329–31 (1972) (2d ed.), we think it improper and a bit unfair to ground an opinion urging reversal of the trial court's principal factual conclusions (that the evidence was equivocal whether the draft was essential to preserve competitive balance, and that the draft had a severely anticompetitive impact) on "facts" culled from a book appearing a year after the trial court's decision. We suggest the factual bases, and therefore legal validity, of the dissent is similarly flawed by reliance on personal observation (note 23) and common knowledge in the community (notes 51 and 69).

Indeed, there are frequent references to events occurring after the oral argument in this case, *e. g.,* O. J. Simpson's 1978 record (p. 29), Terry Metcalf's 1978 Canadian contract (note 69), the New York Yankees' recent success (p. 53). One man's reminiscences of a popular sport should not be confused with a judicial decision.

If Judge Bryant's principal factual conclusion is to be set aside, as our colleague urges, it must be on the ground that it was clearly erroneous, see *Daniels v. Hadley Memorial Hospital,* 185 U.S.App.D.C. 84, 91, 566 F.2d 749, 756 (1977), and, surely, clearly erroneous on the record before him, see *Garcia v. American Marine Corp.,* 432 F.2d 6, 8 (5th Cir. 1970) (per curiam); *U. S. v. Summit Fidelity & Surety Co.,* 408 F.2d 46, 48 (6th Cir. 1969); *C. Wright and A. Miller,* Federal Practice and Procedure

of the draft, as the evidence established and as the District Court found, was to lower the salary levels of the best college players. There can be no doubt that the effect of the draft as it existed in 1968 was to "suppress or even destroy competition"[50] in the market for players' services.

The justification asserted for the draft is that it has the legitimate business purpose of promoting "competitive balance" and playing-field equality among the teams, producing better entertainment for the public, higher salaries for the players, and increased financial security for the clubs. The NFL has endeavored to summarize this justification by saying that the draft ultimately has a "procompetitive" effect, yet this shorthand entails no small risk of confusion. The draft is "procompetitive," if at all, in a very different sense from that in which it is anticompetitive. The draft is anticompetitive in its effect on the market for players' services, because it virtually eliminates economic competition among buyers for the services of sellers. The draft is allegedly "procompetitive" in its effect on the playing field; but the NFL teams are not economic competitors on the playing field, and the draft, while it may heighten athletic competition and thus improve the entertainment product offered to the public, does not increase competition in the economic sense of encouraging others to enter the market and to offer the product at lower cost. Because the draft's "anticompetitive" and "procompetitive" effects are not comparable, it is impossible to "net them out" in the usual rule-of-reason balancing. The draft's "anticompetitive evils," in other words, cannot be balanced against its "procompetitive virtues," and the draft

be upheld if the latter outweigh the former. In strict economic terms, the draft's demonstrated procompetitive effects are nil.

The defendants' justification for the draft reduces in fine to an assertion that competition in the market for entering players' services would not serve the best interests of the public, the clubs, or the players themselves. This is precisely the type of argument that the Supreme Court only recently has declared to be unavailing. In *National Society of Professional Engineers v. United States*,[51] the Court held that a professional society's ban on competitive bidding violated § 1 of the Sherman Act. In so holding the Court rejected a defense that unbridled competitive bidding would lead to deceptively low bids and inferior work "with consequent risk to public safety and health,"[52] terming this justification "nothing less than a frontal assault on the basic policy of the Sherman Act."[53] Ending decades of uncertainty as to the proper scope of inquiry under the rule of reason, the Court stated categorically that the rule, contrary to its name, "does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason,"[54] and that the inquiry instead must be "confined to a consideration of [the restraint's] impact on competitive conditions."[55] The purpose of antitrust analysis, the Court concluded, "is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry. Subject to exceptions defined by statute,

§ 2577 and n.94 (1971), without the wholesale importation of "facts" judicially noticed for the first time on appeal. *See* Davis, *A system of Judicial Notice Based on Fairness and Convenience*, in Perspectives of Law 94 (Bound ed. 1964); *cf. Landy v. Federal Deposit Insurance Corp.*, 486 F.2d 139, 150–51 (3rd Cir. 1973).

50. *Chicago Bd. of Trade v. United States*, 246 U.S. at 238, 38 S.Ct. 242.

51. 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (U.S. 25 April 1978), *aff'g* 181 U.S.App.D.C. 41, 555 F.2d 978 (1977).

52. 435 U.S. at 693, 98 S.Ct. 1355, at 1366 (footnote omitted).

53. *Id.* at 695, 98 S.Ct. at 1367.

54. *Id.* at 688, 98 S.Ct. at 1363.

55. *Id.* at 690, 98 S.Ct. at 1364 (emphasis added; footnote omitted).

that policy decision has been made by Congress." [56]

Confining our inquiry, as we must, to the draft's impact on competitive conditions, we conclude that the draft as it existed in 1968 was an unreasonable restraint of trade. The draft was concededly anticompetitive in purpose. It was severely anticompetitive in effect. It was not shown to have any significant offsetting procompetitive impact in the economic sense. Balancing the draft's anticompetitive evils against its procompetitive virtues, the outcome is plain. The NFL's defenses, premised on the assertion that competition for players' services would harm both the football industry and society, are unavailing; there is nothing of procompetitive virtue to balance, because "the Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable." [57]

We recognize, on analogy with the Supreme Court's reasoning in *Goldfarb* [58] and *Professional Engineers*, that professional football "may differ significantly from other business services, and, accordingly [that], the nature of the competition" [59] for player talent may vary from an absolute "free market" norm. Given the joint-venture status of the NFL clubs, we do not foreclose the possibility that some type of player selection system might be defended as serving "to regulate and promote . . . competition" in the market for players' services. [60] But we are faced here, as 'the Supreme Court was faced in *Professional Engineers*, with what amounts to a "total ban" on competition, [61] and we agree with the District Court that this level of restraint cannot be justified. The trial judge concluded, with pardonable exaggeration, that the draft system at issue was "absolutely the most restrictive one imaginable." [62] Even though the draft was justified primarily by the need to disperse the *best* players, it applied to all graduating seniors, including average players who were, in a sense, fungible commodities. It permitted college players to negotiate *with only one team*. If a player could not contract with that team, *he could not play at all*.

Without intimating any view as to the legality of the following procedures, we note that there exist significantly less anticompetitive alternatives to the draft system which has been challenged here. The trial judge found that the evidence supported

56. *Id.* (footnote omitted).

57. *Id.* at 696, 98 S.Ct. at 1368.

58. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 788–89 n.17, 95 S.Ct. 2004, 2013, 44 L.Ed.2d 572 (1975):
   The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect, and other features of the profession, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently.

59. 435 U.S. at 696, 98 S.Ct. at 1367.

60. *Id.* See *Chicago Bd. of Trade v. United States*, 246 U.S. at 238, 38 S.Ct. 242, *quoted* in note 45 *supra*.

61. 435 U.S. at 695, 98 S.Ct. 1355. The Redskins contend that the draft did not eliminate competition, since it permitted bargaining between the club and the player following the player's selection in the draft. *See* note 47 *supra*. Yet here again the parallel with the argument and decision in *Professional Engineers* is telling. The Society argued "that competition, in the form of bargaining between the engineer and customer, is allowed under its canon of ethics once an engineer has been initially selected. . . . It then contends that its prohibition of competitive bidding regulates only the *timing* of competition, thus making this case analagous to *Chicago Board of Trade* . . . ." The Court found this reliance on *Chicago Board of Trade* misplaced, pointing out that "petitioner's claim mistakenly treats negotiation between a single seller and a single buyer as the equivalent of competition between two or more potential sellers". *Id.* at 693 n.19, 98 S.Ct. at 1366. The football player draft produced a much more noncompetitive imbalance in the respective negotiating positions of players and single team than the positions of the parties in *Professional Engineers*.

62. 420 F.Supp. at 746.

the viability of a player selection system that would permit "more than one team to draft each player, while restricting the number of players any one team might sign." [63] A less anticompetitive draft might permit a college player to negotiate with the team of his choice if the team that drafted him failed to make him an acceptable offer.[64] The NFL could also conduct a second draft each year for players who were unable to reach agreement with the team that selected them the first time.[65] Most obviously, perhaps, the District Court found that the evidence supported the feasibility of a draft that would run for fewer rounds, applying only to the most talented players and enabling their "average" brethren to negotiate in a "free market" [66] The least restrictive alternative of all, of course,

would be for the NFL to eliminate the draft entirely and employ revenue-sharing to equalize the teams' financial resources—a method of preserving "competitive balance" nicely in harmony with the league's self-proclaimed "joint-venture" status.[67]

We are not required in this case to design a draft that would pass muster under the antitrust laws. We would suggest, however, that under the Supreme Court's decision in *Professional Engineers*, no draft can be justified merely by showing that it is a relatively less anticompetitive means of attaining sundry benefits for the football industry and society. Rather, a player draft can survive scrutiny under the rule of reason only if it is demonstrated to have positive, economically *procompetitive* benefits

**63.** *Id.* at 747. *See* Note, *supra* note 19 at 425 (in order for player draft to be a reasonable restraint, "at least a minimal opportunity to deal with more than one team should be assured").

**64.** *See Kapp v. NFL*, 390 F.Supp. 73, 82 (N.D. Cal.1974) (suggesting that NFL draft is unreasonable because it permits boycott of player "even when the drafting club refuses or fails within a reasonable time to reach a contract" with him), *aff'd in part and appeal dismissed in part as moot*, 586 F.2d 644 (9th Cir. 1978). The NBA has adopted a selection system under which a player is free to negotiate with any team if the drafting team fails within a stated time to tender a contract containing specified minimum terms. *See Robertson v. National Basketball Ass'n*, 556 F.2d 682, 686 & n.5 (2d Cir. 1977), *aff'g* 72 F.R.D. 64, 69–70 & n.1 (S.D.N.Y.1976) (approving settlement). The NFL and its Players' Association have likewise adopted a less restrictive draft under which "the selecting club does not obtain a perpetual right of negotiation with the players" and "players who are unable to come to acceptable contract terms with the club selecting them can become free agents after limited periods of time." *Alexander v. NFL*, No. 4–76–Civil 123 (D.Minn. 29 July 1977), slip op. at 27 (approving settlement of *Mackey* case). *See* note 6 *supra*.

**65.** *See* Note, 55 Nebr.L.Rev. 335, 354 (1976) (arguing that NFL draft would be "reasonable" if conducted in two sessions, with players who fail to sign after second session becoming "free agents" thereafter); Note, *supra* note 19 at 423, 425 (arguing that professional baseball draft, which allows player to be "redrafted" by another club if the first club fails to sign him within given time, "has proven itself to be a

workable alternative to the more restrictive drafts used in other sports and thus should be required in all sports").

**66.** 420 F.Supp. at 746–47. *See* Note, 55 Nebr. L.Rev. 335, 353 (1976) (arguing that NFL draft would be "reasonable" if it lasted for five rounds instead of 17). *Cf. Mackey v. NFL*, 543 F.2d 606, 622 (8th Cir. 1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977) (holding Rozelle rule "unreasonable," *inter alia*, because it applied not just to better players, but "to every NFL player regardless of his status or ability"); Note, *The Legality of the Rozelle Rule and Related Practices in the National Football League*, 4 Ford.Urb.L.J. 581, 589–90 (1976) (arguing that Rozelle rule would be "reasonable" if it did not apply to "average" players). The NFL and its Players' Association recently have adopted a less restrictive draft which "extends to fewer players by continuing for fewer rounds." *Alexander v. NFL*, No. 4–76–Civil 123 (D.Minn. 29 July 1977), slip op. at 27 (approving settlement of *Mackey* case). *See* note 6 *supra*.

The NFL suggests that a draft of fewer rounds would not have helped plaintiff, who was a first-round draft choice in 1968. *See* Brief of NFL at 50. Yet if the teams were *forced* to compete for the services of *average* players it is probable that those players' salaries would rise, thus lifting the "floor" at which compensation for the most talented players, subject to the abbreviated draft, would have to begin. A "free market" for the services of *most* players, in short, would have pushed the salary levels of *all* players up.

**67.** *See* Note, 9 Conn.L.Rev. 336, 344–45 & n.55 (1977).

that offset its anticompetitive effects, or, at the least, if it is demonstrated to accomplish legitimate business purposes and to have a net anticompetitive effect that is *insubstantial*.[68] Because the NFL draft as it existed in 1968 had severe anticompetitive effects and no demonstrated procompetitive virtues, we hold that it unreasonably restrained trade in violation of § 1 of The Sherman Act.

### C. *Damages*

■ The trial court found that plaintiff would have negotiated a more remunerative contract but for the draft as it existed in 1968, and estimated his damages (before trebling) at $92,200—the difference between plaintiff's actual compensation and what his "services would have brought in a free market."[69] Plaintiff urges that this estimate was too low. He contends principally that it was error to include in the subtrahend the $19,800 he was paid after his injury, since the Redskins allegedly are seeking to offset this sum against his pending workmen's compensation claim.[70] Defendants urge that the estimate was too high. They contend that Pat Fischer, an eight-year veteran and twice all-pro, was not comparable to plaintiff, an untried "rookie"; and that the trial court's hypothesis of a three-year "fully guaranteed" contract was speculative, since no Redskins'

first-round draft choice and no defensive back in NFL history—rookie or veteran—had ever negotiated such advantageous terms.

The computation of damages in antitrust cases invariably has a certain Alice-in-Wonderland quality to it. As the Supreme Court has observed, "damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts."[71] Detailed proof of injury is particularly difficult here: because the draft has existed continuously since 1935, there has never existed (as there usually exists, for example, in price-fixing cases) a "free market" for players' services that might serve as a guide to the prices that would have prevailed absent the antitrust violation.[72] In view of such difficulties of ascertainment, the fact-finder is permitted to make "a just and reasonable estimate of the damage based on relevant data," which may include "probable and inferential as well as direct and positive proof."[73] "The essential thing is that the available data be used in rational ways which warrant confidence that the damage figure reached is, in fact, a reasonable if imprecise estimate, rather than a speculative guess."[74]

Making full allowance for the deference that must be accorded the trier of fact, we have concluded after examining the record that his damage calculation must be over-

---

**68.** The Supreme Court in *Professional Engineers*, however, suggested that ethical norms designed to regulate competition, and marketing restraints relating to product safety, can be justified only if they "have *no* anticompetitive effect." 435 U.S. at 696 n.22, 98 S.Ct. 1355 (emphasis added). *See id.* at 699, 98 S.Ct. 1355 (Blackmun, J., concurring).

**69.** 420 F.Supp. at 749.

**70.** Paragraph 12 of the Standard Player Contract signed by Smith and the Redskins provides:

Any payments made hereunder to the Player, for a period during which he is entitled to workmen's compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability shall be deemed an advance payment of workmen's compensation benefits due the Player, and the Club shall be entitled to be

reimbursed the amounts thereof out of any award of compensation.

Plaintiff's other arguments for a higher damage award, which need not be detailed here, are frivolous, and were properly rejected by the District Court.

**71.** *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969).

**72.** *See Alexander v. NFL*, No. 4–76–Civil 123 (D.Minn. 29 July 1977), *slip op.* at 18 (approving settlement of *Mackey* case).

**73.** *Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946), *quoting Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 561–64, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

**74.** L. A. Sullivan, *supra* note 15 at 787 (footnote omitted).

turned. Inclusion of the disputed $19,800 in Smith's "actual compensation," we think was clearly proper;[75] and the comparison with Pat Fischer, while it produced a hypothetical annual salary ($54,000) well in excess of that paid to any rookie defensive back in NFL history—even during the years of the NFL–AFL "bidding war"—was not clearly erroneous.[76] But there was simply no evidence to support the judge's finding that Smith, absent the draft, would have been able to negotiate a contract containing a guarantee of three years' full salary, regardless of injury.[77] No such

**75.** Plaintiff's "actual damages" obviously were reduced by the $19,800 that he actually received, and his actual receipt of this sum cannot be ignored on the speculative chance that the Redskins may claim and be allowed it as an offset to an unrelated and as yet undetermined liability. The fact that the Redskins have derived a benefit from their payment of this sum in this case, of course, may prevent them, on some sort of estoppel theory, from deriving a second benefit from it in the workmen's compensation suit; but that question is of no concern to us here.

**76.** Pat Fischer, like plaintiff, was a defensive back who signed with the Redskins in 1968. Although Fischer was a seasoned player, it cannot be said that Smith, an All-American first-round draft choice, was demonstrably out of Fischer's league. A very rough index of the two players' comparability was furnished by the NFL Commissioner's refusal, in a 1968 Rozelle Rule transaction, to award Smith as "compensation" to Fischer's former team. *See* 420 F.Supp. at 749 & note 6 *supra.* Putting to one side the murky question of how "bonuses" are to be allocated, see 420 F.Supp. at 749 n.9, Smith's actual one-year compensation ($28,000 "bonus" plus $22,000 salary) and Fischer's annualized one-year compensation ($24,000 "bonus" plus $30,000 salary) are not too far apart anyway. The trial judge was obliged to find *some* guideline to Smith's hypothetical compensation under conditions more nearly approximating a free market. He came up with a player who played a defensive position similar to plaintiff's and signed as a "free agent" with the same team in the same year. Bearing in mind "the familiar rule that a wrongdoer is responsible for uncertainty in calculating the damages proximately caused by his own wrongdoing," *Lehrman v. Gulf Oil Corp.,* 464 F.2d 26, 45 (5th Cir.), *cert. denied,* 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972), we cannot say that the trial judge's comparison was unreasonable.

**77.** The District Court's findings on this score are contained in 420 F.Supp. at 748:

> The evidence showed unequivocally that top players at that time were being offered long-term contracts by some teams, including at times the Redskins. The Court concludes that a player of plaintiff's talent would certainly have been able to negotiate a three-year contract on very favorable terms in the

absence of the restraints imposed by the owners. The evidence also showed that such players were able to negotiate contracts which guaranteed payment for the full term of the contract even if the player were injured ("fully vested contract" or "injury protection clause"). On the basis of the evidence of the contracts being negotiated at times elsewhere in the league and by the Redskins during the relevant period, and considering that such protection was shown to be of great concern to players of plaintiff's caliber, the Court also concludes that plaintiff would have been able to include such injury protection in a long-term contract had it not been for the illegal restraints imposed upon him.

Numerous, references appear in the record to so-called "no-cut" contracts, which were frequently negotiated in the league. It is apparently undisputed, however, that such contracts did not guarantee salary payments, in the event of debilitating injury, beyond the year in which the injury occurred. *See* Brief of Pro-Football, Inc. at 22. Additionally, the record contains references to several multi-year player contracts from which the player's warranty of "excellent physical condition" was excised. Again it appears that the provision does not assure salary payments, in the event of injury, over the full course of the contract period. Characterizing two such contracts, plaintiff stated that the salary would be paid "as long as [the player] was physically fit." *See* Brief of Appellee Smith at 7a (contract of Bill Yearby); *id.* at 9a (contract of Carl McAdams). Whether this is a sensible construction of such language is, needless to say, not before us. So interpreted, however, the contracts plainly do not support the judge's finding that Smith, absent the draft, would have been able to negotiate a contract guaranteeing three years' salary, regardless of injury.

Although we set aside the trial court's damage award insofar as it depends on a conjectural guarantee of three years' salary, regardless of injury, we do not intend otherwise to circumscribe on remand the trial court's discretion in computing plaintiff's damages. We do in passing note with approval the approach taken by Judge Bryant at trial, *see* 420 F.Supp. at 749 n.9, in ignoring arguable distinctions between salary and

guarantee had been negotiated by Pat Fischer, the trial court's object of comparison, and no such guarantee had ever been negotiated by any Redskins' first-round draft choice, or by any defensive back at any time in NFL history. The evidence established that multi-year guaranteed contracts expose clubs to great financial risk, and that such guarantees in consequence can generally be negotiated only by veteran players of "Hall of Fame" caliber in key positions. There was, moreover, considerable evidence that Smith, like many rookies, was not even *interested* in a multi-year guaranteed contract, preferring more "up-front" money and the right to negotiate new terms on the basis of his first-year performance.

Nor do we think that the district judge was free to ignore all this evidence on the theory that it was irrelevant to what would have happened under "free market conditions." Draft or no draft, Smith's ability to negotiate such lucrative terms would have depended on the Redskins' capacity to afford them. The Redskins, like the other NFL clubs, presumably were charging for tickets and TV rights approximately what

the market would bear, yet their operating income was only $260,000 in 1968 and $300,-000 in 1969. Sheer economics as well as consistent past practice may thus have prevented the Redskins from assuming, in the case of an untried rookie, the financial risks attending the type of contract Smith proposes.

For these reasons, we conclude that the trial judge's hypothesis of a fully guaranteed, three-year contract can be characterized only as a "speculative guess." There was no evidence on which this hypothesis could be founded, no evidence from which it could be inferred. We accordingly remand this case to the District Court for recomputation of damages.

*Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.*

MacKINNON, Circuit Judge, concurring in part and dissenting in part:

We are here called upon to rule in a backhanded way upon the validity under the antitrust laws of the National Football League's 1968 college player draft.[1] The

---

bonus for purposes of measuring overall player compensation. In this regard, setting aside a particular item of damages which we think to be without support, we intimate no view on the overall reasonableness of the damage award apart from the particular theory on which it was made.

1. The principal Supreme Court decisions on the application of the antitrust laws to sports started in 1922 with *Federal Baseball Club v. National League*, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922). In that case, Justice Holmes, speaking for a unanimous Court, ruled that the business of giving baseball exhibitions for profit "would not be called trade or commerce in the commonly accepted use of those words" and hence the league's acts "were not interference with commerce among the States." 259 U.S. at 209, 42 S.Ct. at 466. Over the years, baseball was subject to intermittent antitrust attack, but courts rejected these challenges on the authority of *Federal Baseball*. *Flood v. Kuhn*, 407 U.S. 258, 272, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972). The Court was asked to reconsider its ruling that the business of providing baseball games for profit was not within the scope of the federal antitrust laws in *Toolson v. New York Yankees*, 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953). Without examining the "underlying issues," the Court reaffirmed the result in *Federal Baseball*, referring to four reasons for that holding: (1) Congressional awareness of and inaction with respect to *Federal Baseball*; (2) baseball's development on the understanding that it was not subject to existing federal antitrust laws; (3) a reluctance to overrule *Federal Baseball* with a consequent retroactive effect; (4) a professed desire that any remedy be supplied by Congress rather than by court decision. 346 U.S. at 357, 74 S.Ct. 78. The meaning of *Toolson* was discussed by Chief Justice Warren in *United States v. Shubert*, 348 U.S. 222, 228–30, 75 S.Ct. 277, 99 L.Ed. 279 (1955). *United States v. International Boxing Club*, 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290 (1955), was a companion case to *Shubert* and was decided the same day. This case applied the principles developed in *Federal Baseball* and *Toolson*, and did not find an antitrust exemption for boxing, 348 U.S. at 243, 75 S.Ct. 259.

*Radovich v. National Football League*, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), was a civil Clayton Act case for damages allegedly suffered by blacklisting the plaintiff for signing with another professional football league in violation of the standard player contract. The Court limited the reach of *Federal*

litigation was not instituted as a class action to benefit players who were allegedly victimized by the player draft but rather as an indirect means of obtaining compensation for a football injury to a player that the court has ruled is not otherwise compensible.[2]  I would similarly deny the claim in this indirect effort.

The district court held that the 1968 college player football draft[3] conducted by the National Football League[4] amounted to a *per se* violation of the Sherman Act, in that it constituted a group boycott,[5] and alternatively, a violation of the Rule of Reason because it was "significantly more restrictive than necessary" to accomplish the valid "player distribution needs of the league [NFL] . . .."[6]  On the basis of such conclusions, and without finding that any particular "less restrictive alternative" would guarantee the survival of the legitimate objectives that were attained by the operation of the draft the district court progressed to its third finding: that plaintiff-Smith was entitled to $276,000 in damages, because he had received $92,000 less compensation than he would have received but for the illegal restraint imposed by the

1968 draft, and he was entitled under the antitrust laws to treble his loss.[7]

In this court, the majority (1) here set aside the district court's conclusion that the 1968 draft was a *per se* violation of the antitrust laws; and, (2) claiming support from the very recent decision of the Supreme Court in *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), affirm the court's second conclusion that the draft violated the Rule of Reason; and, (3) finding that the testimony does not support the conclusion that in a free market Smith would have been able to negotiate a three-year contract, set aside the trial court's computation of damages and remand for recomputation by the district court.

I concur in the majority's conclusions and the reasoning in support thereof that the NFL college player draft is not the type of group boycott that had traditionally elicited invocation of the *per se* rule and that the district court should not have found the draft to be a *per se* violation of the antitrust laws.[8]  However, for reasons herein-

---

*Baseball* to the sport of baseball, and held that football was subject to the federal antitrust laws.  352 U.S. at 451, 77 S.Ct. 390.  That baseball was exempt from the antitrust laws was reaffirmed in *Flood, supra,* 407 U.S. at 285, 92 S.Ct. 2099, but the Court also stated that "[o]ther professional sports operating interstate—football, boxing, basketball, and, presumably, hockey and golf—are not so exempt." 407 U.S. at 282–83, 92 S.Ct. at 2112.  Justice Douglas, in his capacity as Circuit Justice, reinstated a district court's injunction *pendente lite* in favor of a professional basketball player and stated that "[b]asketball  .  .  .  does not enjoy exemption from the antitrust laws." *Haywood v. National Basketball Association,* 401 U.S. 1204, 1205, 91 S.Ct. 672, 673, 28 L.Ed.2d 206 (1971).

It is clear that the business of giving football exhibitions for profit is not exempt from the reach of the federal antitrust laws.  No case involving the validity of a player draft in any sport has reached the Supreme Court.

**2.** This case was previously before this court, *Smith v. Pro-Football, Inc.,* No. 74–1958, on an interlocutory appeal from orders of the district court granting summary judgment to defendants on plaintiff's common law negligence claim and his personal injury claim asserted

under the antitrust laws.  This court affirmed the judgment of the district court by order without opinion on September 25, 1975.

**3.** The terms of the 1968 draft have been modified in accordance with subsequent collective bargaining negotiations between the National Football League Players Association and the National Football League Management Council.  National Football League Properties, Inc.  The NFL's Official Encyclopedia History of Professional Football 83 (1977) (hereafter "Encyc.").

**4.** The National Football League is hereafter referred to as the "NFL" or the "League."  The defendant Pro-Football, Inc. is also referred to as the "Redskins" or the "team."

**5.** *Smith v. Pro-Football, Inc.,* 420 F.Supp. 739, 744–45 (D.D.C.1976).

**6.** *Id.,* at 745–47.

**7.** *Id.,* at 747–49.

**8.** In some respects, the college player draft resembles horizontal market division, which is illegal *per se* without regard to market power or discernible anticompetitive effect.  *United*

after set forth, I disagree with the majority's holding that the draft is a violation of the Rule of Reason and with its reasoning that the Supreme Court's decision in *Engineers* requires that conclusion. Assuming *arguendo* that the draft as it existed in 1968 was a violation of the antitrust laws, I would concur with the majority in setting aside the trial court's computation of damages. However, even there, I would disagree with the majority's theory as to the proper measure of damages.

## I. BACKGROUND

My views are in general agreement with the factual statements set forth in the majority opinion (Maj. Op. at ——————— of 193 U.S.App.D.C., at 1174–1175 of 593 F.2d). However, there are many other material facts, which, in my view, are important to a full understanding of the antitrust implications of the draft and of the proper measurement of Smith's alleged damages.

### A. *The Circumstances of Smith's Signing with the Redskins.—*

To have a more complete understanding of the negotiations which culminated in Smith signing his player's contract with the Redskins, it should be noted that Otto Graham, who was head coach and general manager of the Redskins between 1965 and 1968,[9] and who conducted the contract negotiations for the Redskins with Smith's agent, at the outset of the bargaining proposed the possibility of a long-term contract and a percentage raise each year. Graham's original offer was for a three-year contract with one option-year, *i. e.,* a possible four-year contract. The beginning salary would have been in the neighborhood of $17,500 with approximately a 10 percent increase each year; the option-year would have been subject to the usual option provisions.[10] Smith and his agent, however, wanted more money immediately. Since clubs are generally willing to pay higher salaries for short-term contracts than for long-term contracts because the latter entails greater risks if the player is injured, Smith and his agent were able to obtain and elected to sign a one-year contract at a higher salary ($22,000 for the year) than the Redskins were willing to pay for a three-to-four year contract with annual raises.[11] A "no-cut contract" was discussed briefly, but was not pursued seriously since, as Graham stated, such a provision in a one-year contract for a first-round draft choice would have been "kind of ridiculous," as a player with such recognized qualifications was practically assured of being kept on the team for the full season.[12]

There was also discussion between Smith's agent and Graham of a fully-vested contract, but nothing materialized in this respect; and in connection with the one-year contract, there was no discussion of compensation for injuries.[13] The agent, however, did advise Smith to take out an insurance policy to protect his insurability in case of injury, and Smith did obtain such insurance.[14] Contract negotiations were closed in early April, 1968,[15] and the actual contract was signed on May 11, 1968.[16] It provided for a salary of $22,000, a $5,000

States v. Topco Associates, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); United States v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967). Putting aside the question of whether the *Topco* rule will survive the continuing erosion in the *per se* rule, it is not immediately apparent how the majority would distinguish these cases. Since I conclude that the draft is essential to the NFL's ability to produce the product it offers to the public, *i. e.,* the "league sport," *see* text at notes 17–53, 59–82 *infra,* I can easily distinguish *Topco* and *Sealy,* where the associations of the parties were not necessary to the parties' ability to produce the products involved.

9. J.A. 1238.

10. J.A. 79–80, 1272–75.

11. J.A. 83–84.

12. J.A. 1245.

13. J.A. 96.

14. *Id.* The agent thought the company was Mutual of New York.

15. J.A. 89–90.

16. J.A. 837.

professional bonus if he "made the team," and a signing bonus of $23,000—$50,000 total.

### B. *The Business of Football, and the History and Purpose of the Draft*

*(1) The Need for this Analysis.*—Since the draft is not illegal *"per se,"* it must be analyzed under the Rule of Reason, the "second category" referred to by *Engineers*, 435 U.S. at 693, 98 S.Ct. 1355, at 1365. Under this standard, the "competitive effect" of the agreement of the teams to maintain a college player draft must

> be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed. . . . [T]he purpose of [this] analysis is to form a judgment about the competitive significance of the restraint . . . ..

*Id.* After analysis of the opinions of the trial court and of the majority and their discussion of the business of professional football as operated in 1968 by the National Football League, I find that the majority and the trial court have overlooked and not given adequate consideration to many significant facts concerning the history of the draft, the reasons which brought it into being and compel its continuance, and the peculiar nature of the business of professional football in the United States.

*(2) The Nature of the Business.*—A critical fact "peculiar to the business" as presently constituted is that the component members of the NFL are not *economically* competitive with each other. In 1968, the NFL operated through 26 separate corporations in an economic joint venture which fielded teams and thereby furnished entertainment—and continue to do so today—to

paid spectators and a large television audience. Each team has a substantial economic stake in the financial success of all the other teams.

Without doubt, the antitrust laws reflect a basic assumption of our economic system: that competition is the most desirable and efficient regulator of economic activity. As stated in *Engineers,*

> The Sherman Act reflects a legislative judgment that ultimately competition will not only produce lower prices, but also better goods and services. "The heart of our national economic policy long has been faith in the value of competition." *Standard Oil Co. v. Federal Trade Commission*, 340 U.S. 231, 248, 71 S.Ct. 240, 249, 95 L.Ed. 239. The assumption that competition is the best method of allocating resources in a free market recognizes that all elements of a bargain— quality, service, safety, and durability— and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers. Even assuming occasional exceptions to the presumed consequences of competition, the statutory policy precludes inquiry into the question whether competition is good or bad.

435 U.S. at 695, 98 S.Ct. at 1367. Application of the policy of competition to professional sports, just as with the application of the policy to other unique, exceptional industries, presents special problems that the Court recognized in *Engineers* do occasionally arise. Professional sports teams are in some respects traditional economic units seeking to sell a product to the public. But economic competition between teams is not and cannot be the sole determinant of their behavior.[17] Professional sports leagues are

---

**17.** NFL teams are economic competitors on the playing field in the sense that each team is competing against all of its opponents for the large economic benefits that go with the play-off and eventually are paid to the winner of the Super Bowl. This competition to create a Super Bowl winner also has an economic base in that most, if not all, of the teams devote practically all their income to hire the best players in an effort to get into the playoffs. *See* J.A. 617–18. In so doing, the teams establish mar-

*ket prices* for players' services that other teams must match, lest they risk serious morale problems with their own teams. These could be self-destructive since the success of a football team is largely dependent upon the morale of the players. J.A. 1411, 1844–45. The playing field rivalry between teams thus results in the teams being indirectly required to compete on a reasonably equal basis with the economic benefits being paid by other teams, even if it takes practically all of their income. If an NFL team

uniquely organized economic entities; the ultimate success of the league depends on the economic *cooperation* rather than the economic competition of its members. *United States v. National Football League*, 116 F.Supp. 319, 323–24 (E.D.Pa.1953); *Note, The Super Bowl and the Sherman Act: Professional Sports and the Antitrust Laws*, 81 Harv.L.Rev. 418, 418 (1967). The product being offered to the public is more than an isolated exhibition—it is a series of connected exhibitions that culminate in the annual grand finale contest between the two teams with the best records in the League, which have demonstrated their prowess in organized, rigidly scheduled League competition. The product being offered the public is the "league sport," and the value of this product at the stadium gate and to the television networks depends on the competitive balance of the teams in the league. Spectators and television viewers are not interested in lopsided games or contests between weak teams.

In many respects, the business of professional football as carried on by the NFL resembles a "natural monopoly." The structure of the League as a single entity outside the antitrust laws was also specifically authorized in 1966 by Act of Congress. *See* note 34 *infra.* As defined by two authorities, a natural monopoly is a

> monopoly resulting from economies of scale, a relationship between the size of the market and the size of the most efficient firm such that one firm of efficient size can produce all or more than the market can take at a remunerative price, and can continually expand its capacity at less cost than that of a new firm

entering the business. In this situation, competition may exist for a time but only until bankruptcy or merger leaves the field to one firm; in a meaningful sense, competition here is self-destructive.

C. Kaysen & D. Turner, Antitrust Policy: An Economic and Legal Analysis 191 (1959). At the present time, the NFL, as an organized association of various teams (or firms), has a statutorily recognized monopoly over production of the "league sport" of major professional football. Anyone who wishes to watch a major professional football game must watch an NFL game, played under NFL rules with NFL teams and players. History suggests that it is easier for the NFL to expand the number of teams than it is for another league to form and operate successfully. Competition may exist for a time, as the experiences of the American Football League and the World Football League demonstrate, but in the long run such competition is destructive and many teams fail, even as they did within the NFL in its free market formative years.

*(3) The History and Effect of the Draft.* —The draft was adopted in 1935 at a time when baseball was recognized as the national sport. In order to consider and evaluate properly the role and effect of the draft, it is necessary to view the conditions that existed in professional football at that time. Books could be written on the changes in professional football between 1935 and 1968; we have room only for a few of the most significant details.

In 1935, there were only nine teams in the NFL; four in the Western Division and five in the Eastern Division.[18] The League

---

today tried to operate on a strict business basis and maximize profits, it is suggested that the team would revolt and local support would dwindle.

The "large economic benefits" referred to above for post-season play are as follows: for each post-season game, a player gets $1/14$ of his salary from the team. With a salary of $31,000, this amount would be about $2,000 a game. J.A. 925. In addition, $8,500 is paid by the League for playing in a conference championship game and $15,000 by the League for winning the Super Bowl. J.A. 926–27. The testimony did not reflect the amount the losers

receive. A squad of 43 players that won the Super Bowl would receive total post-season play compensation of $1,290,000, with approximately $30,000 going to each team member. The other teams also receive substantial compensation. The foregoing figures were apparently related to the collective bargaining contract and League compensation around 1970. It is assumed that the 1968 situation was substantially comparable; otherwise, the evidence would have been irrelevant.

**18.** The Eastern Division was comprised of the New York Giants, the Brooklyn Dodgers, Pittsburgh, the Boston Redskins, and Philadelphia.

was confined to a few cities in the east, and extended no further west than Chicago. Squads were much smaller (around 22 players, instead of 43 to 47), a free market existed for players' services, and salaries were much lower.[19] Even the game itself was substantially different. The rules were designed to create a game for the players rather than to attract spectators by what today in many contests results in what may accurately be described as basketball on grass. Players formerly had to be able to play both on offense and defense and to be in condition to play 60 minutes if necessary rather than only one way for less than 30 minutes; substitution was greatly limited; platooning of offensive, defensive, kicking, and special teams was *not* permitted; and winning teams stressed the running game from various formations, instead of forward passing from the "T formation" where 9 men are called upon to try to block 11 on running plays with little or no deception that characterized the T formation when it was revived in the 30's. There were fewer crippling injuries because players were younger and they did not play at the excessive weights that are prevalent today. Four teams generally dominated the League—the Chicago Bears, the New York Giants, the Green Bay Packers, and the Boston (later Washington) Redskins.[20] The 1935 regular season consisted of 12 games, which included home and away games with teams in the same division; the season was followed by one championship game between the winners of each division.

During this era of the sport, the League was in substantial competition with business in general and coaching positions for college graduates. For many good football players coming out of college the professional football teams could not compete with the salaries, security and future prospects that were offered by business, the professions, and coaching jobs in colleges, universities and other educational institutions and so they elected not to sign pro contracts. Also, the best coaches chose to remain with colleges and universities. Many players recognized that professional football, at best, was only a seasonal occupation of limited duration at best, that the pay was modest, that it offered only temporary income with some risk of injury, and that once their playing days were over (even today, the average playing life of a player is only about four and one-half years),[21] they would have to start belatedly in their life's work. Many players recognized that the delay in starting their permanent career, or in interrupting it for a few professional seasons, could impair their permanent careers. For that reason, many college players passed up professional football and went directly into business. Lucrative jobs coaching college football, with the opportunity for embarking on a well-paying lifetime career with considerable stability, presented substantial competition for the outstanding players, and these job opportunities in the teaching profession also carried the opportunity for eventual tenure and retirement. As Paul Brown, a former coach at Ohio State University and later coach of the Cleveland Browns and the Cincinnati Bengals, testified, graduating players at Ohio State never thought about playing professional football.[22] A great many of those who played did so because "they liked to play football";[23] and it is fair to

---

The Western Division was comprised of the Chicago Bears, Green Bay, Detroit, and the Chicago Cardinals. Encyc., at 29.

19. *See* J.A. 1336.

20. J.A. 1310.

21. J.A. 1343.

22. J.A. 1455.

23. On December 14, 1941, I was having breakfast in Chicago with Red Smith, a former play-

ing opponent of mine of Notre Dame ('25, '26), then line coach of the Green Bay Packers, who were scheduled that afternoon to play the Chicago Bears for the Western Division Championship. One by one, as the Green Bay players came in for breakfast, I noticed an unusual number of former players from the University of Minnesota. Most of them had been average football players on fine teams at Minnesota, but all were not the outstanding "stars" the public expect to be on the roster of one of the top professional teams that was playing for the championship. When the number of former

say that the "mercenary" element had not affected the sport to the extent it has today (and that has produced a host of complications). Some college players also went to graduate school to prepare for a profession; some went into other professional sports. In 1935, professional football was thus in substantial competition with a host of other vocations and occupations for graduating college players. Even among those who played, many only devoted a half-day to the team, and thus did not give the game the effort that it would come to demand in 1968.

Prior to the first draft, there was a "free market" for players' services. Even so, players' salaries were very modest, and limited club incomes made many franchises precarious. The League would go through 40 franchises before it reached its present stability, with 28 teams.[24] The testimony shows that the Chicago Bears, even though they won the League Championship in 1932, lost $18,000; George Halas, their coach and owner, at the end of the season had to give promissory notes for $1,000 each to Bronko Nagurski and Red Grange for the balance due on their salaries.[25]

The college player draft was adopted in 1935 at the suggestion of Bert Bell,[26] after Cincinnati (which finished the season as the St. Louis Gunners), the bottom team in the Western Division in 1934, had been forced to drop out of the then 10 team league.[27] The 1935 draft as adopted was a pure draft

—simple, uncomplicated, and complete. The team with the poorest winning record drafted first; the others followed in inverse order to their won-lost record; the team with the best record in the prior season drafted last. In its early years, the draft covered 30 rounds, but was later reduced to 17 rounds.[28]

The draft was first conducted in 1936 and has continued annually for the last 42 years. If we assume that roughly 400 players have been drafted each year, approximately 17,-000 players have been drafted by professional football teams. What is significant about this large number is that, although a great many players have been affected by the draft, there have been a relatively insignificant number of lawsuits challenging the validity of the draft as conducted by the NFL. Maj. Op., at —— of 193 U.S.App. D.C., at 1176 of 593 F.2d. This case is stated to be one of first impression attacking the legality of the draft under the antitrust laws.[29] It is also a material fact, of considerable significance, that no case has been pointed to where the Antitrust Division of the Department of Justice has ever attacked the validity of a player draft in any professional sport.

In my view, there are compelling reasons why the draft has continued so long without serious challenge. In effect a player draft is *natural* for league sports. Competitive equality among the component teams is an inherent requirement for meaningful

---

Minnesota players on the small squad that Green Bay carried in those days got to eight (Hal Van Every, Andy Uram, Bill Johnson, Bill Kuusisto, Larry Buhler, Charlie Schultz, George Svendson, Lou Midler—the NFL Encyclopedia erroneously lists Midler as being from Northwestern, *see* Encyc. at 144), all of whom I had known initially since they were freshmen and some from their high school days, I said to Red, "You have a great many Minnesota boys?" He replied, "Yes, we like them." I then asked, "What do you like about them?" He thought a minute, and replied, "I guess they just like to play football."

**24.** J.A. 1796.

**25.** Encyc., at 27; J.A. 1345.

**26.** J.A. 1310.

**27.** Encyc., at 28–29. The Cincinnati Reds lost eight straight games, after which the franchise and some of the players moved to St. Louis. The St. Louis Gunners played three games during the remainder of the season, losing two of them. *Id.* The Reds-Gunners franchise did not return for the 1935 season. *Id.*, at 29.

**28.** J.A. 1345–46.

**29.** In *Kapp v. National Football League*, 586 F.2d 644 (9th Cir. 1978), the court affirmed the trial court's instructions to the jury on damages. The jury found after a lengthy trial that Kapp "could not prove he had been damaged by the general illegality of the rules used by the NFL." At 648. One of the rules attacked by Kapp was the college player draft. At 646.

sports competition and the survival of a conference or league—high school, college, or professional—and all of its members.[30] Close rivalries are the backbone of any successful sport. When the NFL established the draft, its objective was to give each team the same fair *opportunity* to be competitive; it sought to achieve a competitive balance among all the League's teams, that is, to "try to equalize the teams." [31] The intended result was to create a situation where each League game would become a closer contest, where spectator interest in the game and the players themselves would be increased, where the interesting individual contests would create an interesting League championship race, and where ultimately the teams and their players would benefit from the greater income resulting from the increased fan interest.

A player draft to achieve competing balance is not new. Early explorers in the American west found the Indians employing a form of the draft in their game of shinny, played with curved sticks and a wooden ball. The *Aborigines of Minnesota*, Minnesota Historical Society (1911) quotes the following description from George P. Belden, "The White Chief" (p. 37):

> [T]he young men . . . go out on the prairie near the camp . . . [and] having found a smooth spot, they halt, and two of the youths, by common consent, take opposite sides and pick out the players, first one and then another, until enough are had.

The need for and the benefits derived from competitive equality are apparent even on sand lots, where two captains "choose up sides"; the flip of a coin determines who chooses ("drafts") first, and subsequent choices are exercised in alternating fashion. If one side was certain to lose the game, the number of people who would be interested in playing or watching would be seriously diminished. Spectators and players are not attached to athletic slaughters or to contests where the result is foreordained.

What lack of competitive balance in a football league can do to spectator attendance was demonstrated during the existence of the All-America Football Conference and is spelled out in the record here. In that League the Cleveland Browns coached by Paul Brown started out drawing 60,000 to 70,000 people for its home games. They won the championship every year, and their "attendance fell down to under 20,000" because the fans said, "Oh, they are going to win anyway. What is the use of going out there?" [32] This is an absolute answer to the contention that the league can survive if competitive equality of the teams is destroyed. There will always be a league but constant losses by their teams would cause many areas to lose their franchises.

All major sports, in recognition of the need for competitive balance, have drafts. Hockey [33] and basketball have drafts, and baseball instituted a draft when it became clear from the long domination of the New York Yankees that the farm system was not producing competitive balance.

Since the first college football player draft was held in 1936, the results sought to be accomplished have clearly been achieved. Some argue that this has been caused by other factors, but the preponderance of the *factual* testimony and record evidence supports a conclusion that the college player draft was the key factor which produced the competitive balance of the teams, which in turn brought about the exciting games and interesting championship races and in-

---

30. The trial court states: "I've never had any questions in my mind about the importance of the balance." J.A. 1759. *See* note 45 *infra*.

31. J.A. 1310.

32. J.A. 1397–98.

33. The draft preference for French-Canadian players, which at one time was allowed to the Montreal Canadiens, the result of which is still being felt, may have been one of the principal reasons for their dominant record in Stanley Cup competition. This may be one example of how a player draft, *unequal in just one particular*, may serve to weaken competitive balance in a league.

creased public interest in the sport, which ultimately led to the huge gate receipts and large television contracts that are presently producing enormous benefits for the players themselves. There was no showing to the contrary in the 2000 page record. The majority argue that it is television that ·produces the interest and the revenues but the balanced teams produced by the draft *came first* and caused the close contests which attracted the public and eventually television.

Since 1935, the number of teams has increased from 9 to today's League of 28 teams, and the number of players per team has also been increased substantially. Instead of the small squads of around 26 players in the early days of the sport, the modern team's roster once swelled to 47 and was later reduced to 43 players. This has increased the total number of active players in the League as a whole to slightly over 1,200. Gate receipts have increased tre-

mendously due to the increased popular interest in the game. Also important are the television revenues, which constitute a large part of each team's annual income. The NFL television contracts between the League and the television networks have distributed hundreds of millions of dollars to all teams in the League; and current news reports indicate that the payments are to be substantially increased. The lucrative television contract, made possible by an *exemption* from the antitrust laws enacted by Congress,[34] is negotiated for all teams by the League Commissioner. These moneys are distributed *equally* to each team in the League without regard to the size of the team's local television market. In 1968 the revenues from television accounted for approximately 30 percent of the total revenue of the Redskins and this was approximately the same percentage as the average for all NFL teams in that year.[35] Team revenue

**34.** Public Law 87–331 provided:

That the antitrust laws, as defined in section 1 of the Act of October 15, 1914, as amended (38 Stat. 730), or in the Federal Trade Commission Act, as amended (38 Stat. 717), shall not apply to any joint agreement by or among persons engaging in or conducting the organized professional team sports of football, baseball, basketball, or hockey, by which any league of clubs participating in professional football, baseball, basketball, or hockey *contests sells or otherwise transfers* all or any part of the rights of such league's member clubs in the sponsored telecasting of the games of football, baseball, basketball, or hockey, as the case may be, engaged in or conducted by such clubs.

September 30, 1961 (75 Stat. 732); 15 U.S.C. § 1291.

The antitrust limitations were also waived in 1966 by Congress to permit the merger of the National and American Football Leagues. Pub. L.No.89–900, Nov. 8, 1966, 80 Stat. 1515.

Specifically the Act of November 8, 1966 provides:

In addition, such [anti-trust] laws shall not apply to a joint agreement by· which the member clubs of two or more professional football leagues, *which are exempt from income tax under section 501(c)(6) of the Internal Revenue Code of 1954 [26 USCS § 501(c)(6)], combine their operations in expanded single league so exempt from income tax, if such agreement increases rather than decreases the number of professional football clubs so operating, and the provisions of which are directly relevant thereto.*

80 Stat. 1515. Allegations that television and its revenues cured all financial problems is negated by the congressional finding as late as 1966 that

The committee was further advised absent the merger, there was a danger that some of the less favorably situated franchises in both existing leagues faced dissolution or transfer to other cities. . . . The merger will improve player strength and financial resources of weaker teams in both leagues. S.Rep.No.1654, on S. 3817, 89th Cong., 2d Sess., 2 (1966).

**35.** J.A. 422, 618. The majority in footnote 46 assert that competitive balance is produced today by equal sharing of television revenues and by the impact of the *coach.* This of course ignores the historical fact, which we are to consider in applying the rule of reason, that the achievement of competitive balance was the purpose of the draft, and that this produced the exciting games throughout the league, that led to the original television contracts and to the increased revenues therefrom. Moreover, the equal sharing of television revenues would not overcome the unlimited financial resources that a few owners are able and willing to make available to produce a winning team.

As to coaches, the majority seek to attack the *fact* that losing teams almost invariably improved their record with players from the succeeding draft, by arguing that firing of "losing coaches" may have been the cause. Naturally some coaches are better than others but the record does not indicate that coaching

from gate receipts, television contracts, and other sources has increased tremendously since 1935, and the NFL teams and their players are the direct recipients of the benefits of the increased national interest in NFL games. College players, 22 years old, coming out of college in 1976 and playing in the NFL were making $20,000 to $150,000 their first year.[36]

No end is in sight to the escalation in benefits received by the players on account of the growth in the interest of NFL football. Many club owners have devoted and continue to devote a very substantial portion of their gross revenue to players' salaries, bonuses, pensions, medical aid, hospitalization, and other player benefits. For some players, their salaries are astronomical. Today, the *average* player salary is $48,000, not including additional fringe benefits worth approximately $6,000, for a six month playing season.[37] Salaries have more than kept pace with inflation: they are 300 percent higher today than they were in 1966.[38] The total salaries that the Redskins Club paid to its players doubled from $1,604,407 in 1968 to $3,350,080 in 1974.[39]

Due to the increased benefits afforded professional football players, the competition for graduating college football players that previously existed from lucrative coaching positions and numerous other business and professional opportunities has been successfully met, if not altogether eliminated as a practical matter. The increasing popularity of pro football and its attractiveness to graduating college players assures those interested in the success of the game—such as television and radio broadcasters and networks, stadium owners, team owners, and players already playing in the NFL—that the best college football players year after year will continue to join the professional ranks and assure the quality and attractiveness of their games. In fact, a great many players now go to college for the sole purpose of establishing a playing record which will result in their being drafted by one of the professional teams; a first-round draft choice in the professional league is viewed by many as the substantial equivalent of *summa cum laude*—and first-round draft choices are generally paid much higher starting salaries.

Football, it is claimed, has now become the national game, supplanting baseball.

---

changes exceed draft results as a factor in producing the improvement in the record of losing teams. Of the Twenty-Three "Winningest coaches" in Pro-football history 15 moved to other teams and only two, Shula and Allen, had winning records with the new team. This excludes Lombardi who was only one year at Washington and had a record of 7 wins, 5 losses and 2 ties. *Encyc.* p. 452. Thus, a new coach is no panacea. Also coaching in the NFL today is not a one man job—staffs are enormous—and the movement of a head coach may not be the critical element. Coaches can make their contribution but in the last analysis the game is played by the players and not even a court should try to deny that fact. When it does, its position is obviously untenable.

As for the majority's statement that the draft did not produce until the 50's and then television did the job, this again is a near-sighted approach and evaluation that blinds itself to the fact that it is the game on the field that is being sold. The statistics indicate that paid attendance at professional games has *regularly increased* steadily to 11,044,018 in 1976, *Encyc.*, p. 437, as the number of league teams has increased from 9 to 28 and their competitive balance has spread throughout the United

States. Also 17 of the stadiums presently in use were built, occupied by new teams, or substantially enlarged to their present capacity in the last 10 years. *Encyc.*, pp. 454–463. The organization of new teams and the building of huge stadiums have *combined* with the improved quality of the product and the advertising it receives from the media to produce its present popularity. This is part of the growth in general sports' interest in the nation which has seen 42 major league teams in all sports in 1959 grow to 117 teams at the last counting. J.A. 290.

**36.** J.A. 1908. *See* J.A. 1585 (trial court acknowledges benefit of draft to players already in League); J.A. 1598–99. However, it is also obvious that the salaries paid to team members directly affect the salaries paid to draftees.

**37.** J.A. 1796. Their pay for six months of endeavor was roughly equivalent to that of Congressmen for a year, and some far exceed that.

**38.** J.A. 1362.

**39.** J.A. 422.

Fan interest in the nearest local team has become so intense that city after city has secured a franchise for a local team and has substantially *subsidized* the entire professional football industry (a fact not generally recognized) by erecting huge stadiums with hundreds of millions of dollars of taxpayers' money or pledges of public credit and with exemptions from the payment of real estate taxes on account of their municipal ownership. There is also an additional subsidy in raising construction funds through tax exempt municipal bonds which because of the tax exemption carry lower interest rates on the borrowed funds. Twenty cities have erected these huge new stadiums with "amortized tax dollars" and of the 29 stadiums in use only four were privately financed.[40] These stadiums facilitate the large crowds that are necessary to enable the "local" team to compete in gate receipts with the teams of other localities that are considered rivals.[41] The local fans in most areas where the teams have established reasonably respectable winning records acquire a strong interest in their local team and a powerful attachment to certain players whose performance they admire. Such interest lags if the team becomes a "loser."

From my analysis, the testimony of record overwhelmingly supports the conclusion that the growth of football between 1935 and 1968 was largely due to the competitive balance that the League achieved during those years and to the creation of a quality product, the "league sport." This competitive balance, and the consequential tremendous growth in public interest, which has inured greatly to the benefit of the players themselves, is in large part a result of the college player draft. The growth in the attractiveness of the team sport has resulted in the expansion of the League; more teams mean more jobs for players. Indeed,

the statute authorizing the merger of the NFL and AFL was conditioned on the expectation that the merger would increase, rather than decrease, the number of franchises, as explained in note 34 *supra*. A larger League, further encouraged by the expanding TV market, means more jobs for players, and ultimately more money for those playing in the League. The draft created the competitive balance, that created the public interest, that led other cities to organize teams, that led to national expansion of the league, that enlarged the total gate receipts, that led to the large revenue producing television contracts. Actually the average attendance at NFL games has only increased 12,697 spectators per game from 43,617 in 1959 to 56,347 in 1976 but the increase in the number of expansion teams has increased the number of games from 72 to 196. Encyc., p. 437. To the contention that it is the revenue from television that produces competitive quality it must be remembered that it was the competitive equality produced by the draft that *came first* and that money alone has never produced competitive equality. We all know that lopsided games are quickly tuned out, and mismatched teams fail to draw. In my view of the record and the dynamics of professional football the draft is also essential to a continuation of competitive balance. If the draft is removed, or its full effect substantially diminished, present balance can continue for a while because of the great strengths that the draft has built up but in my opinion the creditable testimony and evidence here reflects that in such event the few advantaged teams will acquire the best players and achieve superiority and eventually the other teams will lose competitive strength and the league will lose balanced strength.

**40.** Examples of recent stadiums are Oakland, Kansas City, New York (Shea Stadium for the Jets), San Diego, Houston (the Astrodome), Buffalo, Denver (J.A. 1700, 1707), and also, to common knowledge, New Orleans and Seattle. In Denver, a $25 million general obligation bond was issued to expand the stadium seating capacity by 24,000 to 75,000. J.A. 1707. To public knowledge, Minnesota under a state law is considering a new stadium to be financed by local taxes in the Minneapolis-St. Paul area. *See generally* J.A. 1801. *Encyc.*, pp. 454-463.

**41.** A serious deficiency in gate receipts could lead to a team being unable to pay salaries that were competitive with other teams in the League because revenues of games are split 60-40 in favor of the home team.

But we seem to be in for judicial tinkering with the draft.

(4) *The Reasons for the Draft.*—The growth of professional football between 1935 and 1968 is, by itself, compelling evidence of the need for the existence of the draft. The product being provided by the component parts of the NFL—the "league sport"—is of high quality because the teams, acting jointly, cooperate in several respects: rigid scheduling of contests, set formulas for reaching the playoffs, uniform rules, disciplinary sanctions, and other player regulatory devices, such as the draft. For example, without uniform rules, which is a restraint on how the players play the game, it is doubtful that the product, the league sport, could even exist.

The draft figures importantly in insuring the vitality of the NFL's product. A former counsel to the NFL Players Association, the American Football League Players Association, and the World Football League Players Association, who at one time or another "represented all professional football players,"[42] assisted in the preparation of a statement (which was later delivered in a speech by the President of the AFL Players Association in January, 1969) which he read into the record in this case:

> The common draft and the option clause are no doubt restrictions on our personal freedom to trade our services. But these restrictions are acceptable in the understanding that they enhance the competition, which alone can provide the profits that pay high salaries, fringe benefits, and expanding job opportunities for all players.

J.A. 1578. To the best of the witness' knowledge, this statement reflected the position of the Board of Representatives of the AFL Players' Association at the time it was made.[43] The evidentiary record indi-cates that almost all members of the football industry, owners, coaches and players alike, recognize the importance of the college player draft. No substantial creditable testimony opposed its merits.

It is significant that the majority opinion recognizes that some sort of draft "might be defended as serving 'to regulate and promote . . . competition' in the market for players services." Maj. Op. at —— of 193 U.S.App.D.C., at 1187 of 593 F.2d. Moreover, the district court stated that the draft violated the antitrust laws because its restraints could be imposed in a less restrictive manner.[44] All of this is but another way of expressing the opinion that the draft in some form would *not* violate the antitrust laws and may be necessary to preserve competitive balance, and concomitantly the quality of the product and perhaps the existence and strength of the League as it presently exists.[45] This indirectly recognizes the uniqueness of the economic nature of the NFL. Each sport has its own peculiarities. As Judge Sprecher held, "baseball cannot be analogized to any other business or even to any other sport or entertainment." *Charles O. Finley, Inc. v. Kuhn,* 569 F.2d 527 at 537 (7th Cir. 1978).

Both the trial court and the majority suggest alternative types of a less restrictive draft which might be legal, but both fail to discuss the further issue, which their suggestions involve—whether the suggested alternatives would preserve the *necessary* competitive balance. There is no evidence of record to support a conclusion that their suggestions would. As a general rule, the majority state that

> a player draft can survive scrutiny under the rule of reason only if it is demonstrated to have positive, economically procompetitive benefits that offset its anticom-

---

42. J.A. 1568.

43. J.A. 1579.

44. 420 F.Supp. at 746–47.

45. *See* J.A. 659–76, 1955–62. In only one of 12 seasons from 1964–1975 did those teams in the bottom half of the NFL's standings fail to win a greater number of games in the next season following priority selections in the draft. Statistical analysis shows that this could not have been the product of chance occurring without regard to the draft. The trial court, as noted above, remarked: "I've never had any question in my mind about the importance of the balance." J.A. 1759.

petitive effects, or, at the least, if it is demonstrated to accomplish legitimate business purposes and to have a net anti-competitive effect that is insubstantial. Maj. Op. at —— of 193 U.S.App.D.C., at 1188 of 593 F.2d. The application of this standard to this case is discussed in greater detail below,[46] but at this juncture it is useful to consider the practicalities of less restrictive restraints, for here the reasons for the draft become more apparent.

A pure draft takes all of the college players that are coming into the market with the teams with the poorest records having preference in the order of their won and lost records. The draft as it existed in 1968 was a pure draft, and it is submitted that the draft should be that extensive if the opportunity for maximum competitive balance is to be assured. If the draft only lasts two rounds, as the trial court here suggested, the rest of the players are left for the free market—and the preponderance of those players, or at least the preponderance of the better players in that group, would go to teams with special attractions and the teams owned by super-wealthy millionaires who desire very greatly to own a winning team.[47] Not even a complete sharing of team revenues could overcome the unfair advantage posed by wealthy owners and collateral attractions of a few cities. Large cities—such as New York, Chicago, Los Angeles, and Washington—offer special advantages for publicity, endorsements, and lucrative off-field jobs in business. Cities with better weather are more attractive to some players, and teams with better prospects of winning in a particular season furnish a certain attrac-

tion for some players.[48] Larger cities with larger stadiums realize more income[49] and hence are somewhat able to offer larger salaries than teams with smaller cities and stadiums. So are teams owned by wealthy sportsmen who place a premium on winning and are willing to support their desires with almost unlimited financial resources. The draft has substantially reduced the ability of these owners to dominate the league.

Given these factors that would permit a few teams to corner the "developing players" that in a great many instances eventually surpass developed players, drafted in the earlier rounds, it is necessary to have a draft that reaches the *maximum number of potential players who are absolutely necessary to preserve competitive balance.* When the draft does not reach that many players, the few stronger teams with the natural advantages will be able to corner the best remaining prospects who become free agents. The testimony indicated that a few "super wealthy" owners with a very deep pocketbook could obtain a very substantial advantage if there were a substantial pool of free market players.[50]

The factual testimony is uncontradicted that the draft is essential to competitive balance and vital to the continuation of public interest and the revenues presently being generated from gate receipts and television contracts. In my opinion the record also supports the conclusion that some form of the draft is the only way to regulate the involved problems. No person has suggested a better solution. It has proved to be effective. I would place the number of draft rounds at a high figure, and err, if at all, on having too many rather than too few

---

**46.** *See* text at page —— of 193 U.S.App. D.C., at page 1206 of 593 F.2d *infra.*

**47.** J.A. 1765, 1801. The Dallas Cowboys return all money to the team, J.A. 1902, and spend about half a million dollars a year scouting for new players. J.A. 1856. About 500 players are considered the "pool" for the draft each year. If only 56 players were drafted in a two-round draft, around 450 players would be in the group left for the free market.

**48.** J.A.1878, 1909. Green Bay was a great attraction for some players when that team was

winning under Coach Vince Lombardi. Green Bay has an added attraction in that the team is publicly owned and operates as a non-profit corporation. All revenues are available for development of the team.

**49.** The home team keeps 60 percent of the gate receipts, and the visiting team takes 40 percent. Teams with a greater home attendance have proportionally more revenues.

**50.** J.A. 1329.

selection rounds. It should be recognized that the losing teams need a wider draft than the winning teams. J.A. 1616, 1626. It is beyond serious dispute that many players with good prospects for development go in the later rounds. After all most draftees are just getting out of college at around 22 years of age and have not reached their maximum mental or physical development. They should not be denied the advantage of having the draft put a value on their services and the losing teams need them. In the early rounds, the teams look for immediate prospects, that is, developed players who can have an immediate impact on the team. In the later rounds, players with prospects of further maturation are likely to be drafted,[51] and havoc would be created if a few teams could garner most of this talent that has not evidenced or achieved its full potential.

The argument that the draft could successfully be limited to a very few rounds is based on the false premise that only the "blue-chip" players or super-stars in college contribute to the success of the professional team. No creditable testimony supports the conclusion that the necessary competitive balance could be assured if the draft were limited to those 56 graduating college players that the scouts deemed the best prospects at the time, much less if it were limited to the 5 to 8 superstars that generally develop annually. Football is a *team* game and a team is generally not made by drafting one or two graduating college "stars."[52] Notwithstanding the fact that the "stars" get the billing, a passing quarterback, for instance, cannot succeed unless the rest of the team are of sufficient ability to do their jobs. If his blockers cannot stop the defensive rush, or his receivers can not get free, the quarterback's ability will never show. Thus, it is pure illusion to suggest that if a few so-called stars or "blue-chip" players were distributed equally by a draft confined to two rounds that a continuation of competitive equality could be assured. So-called "stars" soon become "black-and-blue" chip players if their teammates who are necessary to their success are overshadowed by players on other teams. The pitiful showing of the "great" O. J. Simpson for this year with the San Francisco 49ers, after moving from his successful years with the Buffalo Bills, is current proof. Winning teams need strong players at all positions,[53] and good players to substitute for those who inevitably become injured. These are not produced solely from first and second round draft choices.

My reading of the entire 2027 page evidentiary transcript leads me to the conclu-

---

51. Bart Starr and Willie Davis were both drafted in the seventeenth rounds. Both became All-Pros, Davis six times. J.A. 1461, 1474. It is also common knowledge in this community that Chris Hanburger, the Redskins' seven-time all-Pro linebacker was an eighteenth round draft choice.

52. J.A. 1776, 1785, 1872.

53. A good example of the need for a strong supporting cast for a star is provided by the drafting of O. J. Simpson by the Buffalo Bills. The circumstances are well known. Simpson won the Heisman Trophy and was drafted by the Bills in the first round in 1969. In 1969 and 1970, Simpson was something of a disappointment because of weaknesses in the Bills' offensive line (J.A. 1831–32). Then as the statistics and personnel roster prove, Encyc. at 103–05, Simpson's performance and the team's success began to improve when the Bills in 1972 began drafting linemen capable of blocking for Simpson. In 1970, the team's record was 1–13; in 1971, it improved to 4–9–1. With the addition of linemen chosen early in the draft, the record improved to 9–5 in 1972, which record was duplicated in 1973. Simpson gained over 1000 yards in 1972, 1974, and 1975; in 1973, he gained a record 2003 yards and interest in the team skyrocketed. In 1976, he gained 1503 yards. A new stadium was built in 1973 and a sell-out crowd of 80,000 watched the first game in it. None of this success occurred until Buffalo used its early draft choices to select outstanding linemen. Simpson was eventually to sign a three-year contract for over two million dollars (Encyc., at 103). It is hard to find a better example to disprove the theory that a few so-called "stars" can make a team a winner. Other similar examples can be pointed to by any sports follower.

The majority object to the use of the Encyclopedia published in 1976 because this case was tried before that date. However, the *facts* occurred before the trial, were well known, and were referred to in the testimony (J.A. 1831–32).

sion that the preponderance of the evidence supports the conclusion that the draft is necessary to provide the essential competitive balance in the NFL. To argue about the fine details of a draft that the players do not complain of, and which is the very heart of their revenue, in order to comply with a hornbook interpretation of a law that was never intended to apply to sports, is pure folly. Also, there has been no showing that less restraints would benefit players in the lower rounds—that is just a speculative, untested assumption. Anyone with only a TV fan's knowledge of pro-football can come up with less restrictive draft procedures. It is always open season in court for such suggestions but none of these carry anything other than a tinkerer's assurance that the *necessary* objective of an equal opportunity for competitive balance will be achieved in the years to come. The same lack of assurance that changes from the wide pure draft will continue in years to come to produce the necessary competitive balance is also true of recent changes in the draft.

## II. THE RULE OF REASON

The starting point in Rule of Reason analysis must be the Supreme Court's recent opinion in *Engineers,* which held that a professional society's canon of ethics which prohibited competitive bidding by its engineer members violated Section 1 of the Sherman Act under the Rule of Reason. The Court stated:

> [T]he Rule [of Reason] does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason. Instead, it focuses directly on the challenged restraint's impact on competitive conditions.

435 U.S. at 688, 98 S.Ct. at 1363. Proper analysis, the Court went on to state, requires looking to the "facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." 435 U.S. at 692, 98 S.Ct. at 1365. The intendment of this analysis is to form a judgment about "the competitive significance of the re-straint." *Id. See* Maj. Op. at ———— of 193 U.S.App.D.C., at 1179–1181 of 593 F.2d.

After *Engineers,* there can be no doubt but that the Rule of Reason requires us to focus on *competitive conditions.* The Court stated that the Rule does not permit an inquiry into the reasonableness of the prices set by private agreement, and does not allow the argument that because of the special characteristics of a particular industry, monopolistic arrangements will better promote trade and commerce than competition. 435 U.S. at 690, 98 S.Ct. 1355. The Court noted that under *Standard Oil v. United States,* 221 U.S. 1, 58, 65, 31 S.Ct. 502, 55 L.Ed. 619 (1911), which first announced the Rule of Reason test, "the inquiry is confined to a consideration of impact on competitive conditions." 435 U.S. at 690, 98 S.Ct. at 1364. This is the very essence of Rule of Reason analysis.

Yet it is equally clear, after *Engineers,* that Rule of Reason is not to be performed by resort to any rigid balancing or weighing formula. The perceptive analysis of Justice Brandeis in *Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), was quoted in part in *Engineers,* 435 U.S. 679, 691, 98 S.Ct. 1355, 55 L.Ed.2d 637, with approval:

> [T]he legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as *merely regulates and perhaps thereby promotes competition* or whether it is such as may *suppress or even destroy competition.* To determine that question *the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable.* The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end

sought to be attained, *are all relevant facts.* This is not because a good intention will save an otherwise objectionable regulation, or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

246 U.S. at 238, 38 S.Ct. at 244 (emphasis added). The entire thrust of the Sherman Act is to set out a broad mandate, to be given shape and content by the judiciary. *See* 435 U.S. at 690, 98 S.Ct. 1355. Just as mere categorization of particular combinations as *per se* illegal results in "an unintended and undesirable rigidity in the law," *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 50 n.16, 97 S.Ct. 2549, 2558, 53 L.Ed.2d 568 (1977), a wooden balancing approach under the Rule of Reason without regard to the factors listed in *Chicago Board of Trade* can lead to the same kind of "rigidity" condemned by the Court in *Continental T.V.*

The majority opinion states that the purpose of Rule of Reason analysis is to determine whether a restraint "is significantly anticompetitive in purpose or effect." Maj. Op. at —— of 193 U.S.App.D.C., at 1183 of 593 F.2d. The majority agree that to make this evaluation the court must analyze "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed," as required by *Engineers.* Then, the majority set forth the following rule:

If, on analysis, the restraint is found to have legitimate business purposes whose realization serves to promote competition, the "anticompetitive evils" of the challenged practice must be carefully balanced against the "procompetitive virtues" to ascertain whether the former outweigh the latter. A restraint is unreasonable if it has the "net effect" of substantially impeding competition.

Maj. Op. at —— of 193 U.S.App.D.C., at 1183 of 593 F.2d. Later in the opinion, the majority elaborate on this rule:

[A] player draft can survive scrutiny under the rule of reason only if it is demonstrated to have positive, economically *procompetitive* benefits that offset its anticompetitive effects, or, *at the least, if it is demonstrated to accomplish legitimate business purposes and to have a net anticompetitive effect that is insubstantial.*

Maj. Op. at —— of 193 U.S.App.D.C., at 1188 of 593 F.2d (emphasis original). At first blush, this language appears to be a fair statement of a test that "focuses directly on the challenged restraint's impact on competitive conditions," 435 U.S. at 688, 98 S.Ct. at 1363, and which takes into account the salient factors necessary to test the reasonableness of a restraint. Upon closer scrutiny, however, the test stated by the majority appears as one which easily lends itself to rigid, wooden application, in contravention of the Court's warning in *Chicago Board of Trade* that the legality of a restraint "cannot be determined by so simple a test, as whether it restrains competition." 246 U.S. at 238, 38 S.Ct. at 244.

It is not enough under the Rule of Reason simply to find that a restraint is anticompetitive in purpose or effect.[54] Under *Engineers* and *Chicago Board of Trade,* an objective anticompetitive purpose will not invalidate a restraint provided the restraint is not "*unreasonably* restrictive of competitive conditions," *Standard Oil v. United States,* 221 U.S. 1, 55, 31 S.Ct. 502, 55 L.Ed. 619 (1911) *quoted in Engineers, supra,* 435 U.S. at 690, 98 S.Ct. 1355 meaning that the restraint has long term procompetitive benefits or promotes legitimate business purposes, which benefits or purposes are surmised from the context of "all [the] relevant facts" set forth in *Chicago Board of Trade,* 246 U.S. at 238, 38 S.Ct. 242. Similarly, an anticompetitive effect may not invalidate a restraint, provided it meets the *Standard Oil* test, as explained above.

This is not to say that courts can consider the factors to which *Engineers* explicitly forbids them to look. But *Engineers* does say that the restraint must be looked at in context. This is consistent with past Supreme Court development of the Rule of

---

**54.** *Compare* Maj. Op. at —— of 193 U.S.App.D.C., at 1183 of 593 F.2d.

Reason. A restraint need not be procompetitive to be valid; the question is whether the restraint is "unreasonably restrictive of competitive conditions."[55] The Eighth Circuit in a current opinion by Chief Judge Gibson, upholding a settlement of a class action antitrust suit by the NFL Players Association which attacked the Rozelle Rule, for compensating teams that had lost players who played out their option, recognized that "[s]ome leveling and balancing rules" were necessary to maintain adequate competitive equality:

> It appears from the objectors' brief and argument that they desire complete, unrestricted freedom of movement from club to club, offering their services to the highest bidder. This position ignores the structured nature of any professional sport based on league competition. Precise and detailed rules must of necessity govern how the sport is played, the rules of the game, and the acquisition, number, and engagement of players. While some freedom of movement after playing out a contract is in order, *complete freedom of movement would result in the best franchises acquiring most of the top players. Some leveling and balancing rules appear necessary to keep the various teams on a competitive basis, without which public interest in any sport quickly fades.* This, of course, is the crux of most of the past restrictive rules and those now in force. Professional sports are set up for the enjoyment of the paying customers and not solely for the benefit of the owners or the benefit of the players. Without public support any professional sport would soon become unprofitable to the owners and the participants.

*Reynolds v. National Football League,* 584 F.2d 280, 287 (8th Cir. 1978). (emphasis

added). An anticompetitive restraint may be valid if, in light of the facts peculiar to the business, the history of and reasons for the restraint, and other factors mentioned in *Chicago Board of Trade,* the restraint is not unreasonably restrictive within the meaning of *Standard Oil.* This demands that the focus be on competitive conditions and the "economic conceptions," 435 U.S. at 690 n.16, 98 S.Ct. 1355, implicit therein. It does not demand a finding of the existence of competitive conditions, though an anticompetitive restraint will not be valid absent some redeeming quality found by analyzing the competitive significance of the restraint, a quality which is sufficient to remove the restraint from the realm of the "unreasonably restrictive."

This interpretation is particularly apparent in the Court's discussion in *Engineers* of *Mitchel v. Reynolds,* 1 P.Wms. 181, 24 Eng. Rep. 347 (1711). *Mitchel* involved the enforceability of a covenant by the seller of a bakery not to compete with the purchaser of the business. The Court noted that the covenant in *Mitchel* was limited both temporally and geographically. 435 U.S. at 688, 98 S.Ct. 1355. The covenant was upheld as reasonable, "even though it deprived the public of the benefit of potential competition. The long-run benefit of enhancing the marketability of the business itself—and thereby providing incentives to develop such an enterprise—outweighed the temporary and limited loss of competition." *Id.* At the bottom line, *Mitchel* involved a total prohibition on competition between the seller and purchaser for a limited period of time in a specified area, and the purpose of the prohibition was to benefit the industry and to promote trade and commerce. The prohibition in *Mitchel* was necessary because of "special characteristics of the

---

**55.** *See Engineers, supra,* 435 U.S. at 694, 98 S.Ct. at 1367: "The Sherman Act does not require competitive bidding; it prohibits unreasonable restraints on competition." This case is distinguishable from *Engineers* in one material respect. *Engineers* imposed an anticompetitive restraint because of the claim that it was necessary to avoid a safety risk to the public. This claim was found to be unfounded. Here the restraint is to preserve maximum

competitive equality and while the majority differs with the degree that the draft contributes to this there is no disagreement that the draft does make a substantial contribution to competitive equality and the quality of the overall team product that is a vital factor in keeping all the league teams strong and viable and an inducement for the organization of other teams and other leagues.

particular industry." The restraint in *Mitchel* helped assure the survival of the business, which would ultimately attract other businesses into the area where the restraint was operative and thereby promote competition.

Yet *Engineers* also states that courts cannot consider whether "monopolistic arrangements will better promote trade and commerce than competition," *id.*, or "whether competition is good or bad." 435 U.S. at 695, 98 S.Ct. at 1367. Clearly, based on the *Engineers* discussion of *Mitchel,* it is possible to have an anticompetitive restraint that does not violate the Rule of Reason. Approving the restraint in *Mitchel* does not involve a judgment about whether competition is good or bad; it is simply a judgment that, based on all the relevant facts set forth in *Chicago Board of Trade* and adopted in *Engineers,* competition that the restraint eliminates is not in the best interest of that business immediately nor in the interest of that industry, insofar as a failing business would discourage new businesses whose entry into the market would promote competition. This analysis focuses on competition, and is consistent with the Rule of Reason.

In a sense, *Mitchel* reflects the philosophy that "some business is better than no business, for with no business, there can never be competition." Yet this philosophy is inconsistent with the implication the majority seems to find in *Engineers* that a court can never look to the effect of restraints on enhancing the business of the parties to the restraint. Maj. Op. at —— of 193 U.S.App. D.C., at 1180 of 593 F.2d. In my view, *Engineers* does not reach as far as this implication, because it is impossible to ignore the effect of a restraint on a business if one is to form an opinion about how a restraint might ultimately serve to attract other businesses and thereby enhance competition. There is nevertheless a tension

present in *Engineers* for it is not easy to distinguish permissible restraints which, though carrying an anticompetitive effect, are not unreasonably restrictive, from impermissible restraints which are designed only to enhance the business of the parties to the restraint. In the final analysis, this tension is unavoidable if the antitrust laws are to retain the flexibility necessary to deal with myriad types of businesses—particularly one as unique as professional sports—in a manner consistent with the manner in which Congress intended the Act to be enforced.

Thus, in my view, to the extent evidence is presented that the draft is essential to or materially enhances the vitality of the NFL, and the economic benefits of the players, I do not believe that such evidence is automatically irrelevant under the Rule of Reason. The mere fact that the restraint increases League revenues or that the quality of the game is improved—viewed apart from any other consideration—is not relevant.[56] But to the extent that the draft figures in the vitality of the business in the *Mitchel* sense, these considerations are relevant.[57] In logic, a successful League may encourage other football leagues to develop—as occurred with the American Football League and more recently the World Football League (although that effort was ultimately to fail). Such leagues created direct competition in the market for players' services. League success may also encourage other sports, similar in attraction or reasonable substitutes for fan interest, to develop—such as soccer—which may compete against football for the attention of the public and possibly for some players. In some instances, the different sports might compete for the same athletes; certainly there is competition for the attention of young athletes training themselves in a sport, with the hope of one day making

**56.** In *Engineers*, the facts that competitive bidding might decrease the quality of the product, or that the public safety might be impaired, were not relevant in testing the reasonableness of the restraint. 435 U.S. at 693, 98 S.Ct. 1355.

**57.** In *Engineers*, there was no suggestion that the ban on competitive bidding contributed to the vitality of the profession or that the ban was in any way essential to the existence of the profession. Here such testimony is not contradicted. J.A. 1769, 1772, 1794, 1826.

themselves available for play in a professional league. It is well known that football drafted some track and basketball players. Such competition between sports is healthy; it gives the public and some players the opportunity to choose between different forms of the same product, the "league sport."

Furthermore, to the extent professional football as a business resembles a natural monopoly, that status is relevant to the analysis. By focusing on competitive conditions, one might come to the conclusion that the business is a natural monopoly, and given all the other factors, one might decide · that the restraint of the draft, vital to the business, is not unreasonable. Where the conditions are such that the forces of competition left alone would produce a monopoly, some organized manner of increasing the number of firms must be developed so that an "artificial competition" can be created where naturally there would be none. Government intervention by regulation or control might provide the artificial competition, or carefully policed agreements among the members of the firm might provide the "artificial competition." Consistently with proper Rule of Reason analysis, the draft can be viewed as a "carefully policed agreement" among the members of the League which is necessary to the stability of the League and ultimately its success as a functional business.

The majority frame the issue as a balancing of the procompetitive effects and the anticompetitive effects of the draft with respect to the market for players' services. It is important to understand the nature of this market. The teams' owners, the purchasers of players' services, are "adverse" to each other in the sense that each owner desires to obtain the most talented available players. The players are to some extent "adverse" to each other, as the players desire to play for the best teams, though what is "best" may vary in the perceptions of different players, just as some people like different foods or colors. It is fair to say that a large percentage of the players are attracted toward the teams that pay the most, have winning records, are located in large cities, and play in a warm climate. Some want to play close to home or where they made their college reputations; or some prefer an invigorating climate with knowledgeable sportswriters and fans who understand the basics of the game. The weight of any particular factor varies according to individual taste· and preference, thus rendering the notion of the "best" team from the players' perspective somewhat variable.

Given this market, the majority opinion assesses the competitive impact of the draft on the competition among the teams' owners for players' services. The majority see the draft as an absolute ban on competition between teams for the services of players just out of college. Finding an absolute anticompetitive effect, the majority conclude there can be no procompetitive benefit. After stating that it is impossible to balance, Maj. Op. at —— of 193 U.S.App. D.C. at 1186 of 593 F.2d, the majority proceed to balance and find what essentially amounts to a predicted outcome to be plain—the anticompetitive effects outweigh the procompetitive benefits, and the draft is invalid. Maj. Op. at —— of 193 U.S.App. D.C., at 1187 of 593 F.2d.

In my opinion this result is not required by *Engineers* or the Rule of Reason. Before dealing with the instant case, it is useful to consider how the majority's approach would deal with a related context where the proper result, in my view, is even more clearly cut.

Regulation of player conduct by disciplinary sanctions is one of several factors which help make the product of the "league sport." Players must perform according to certain rules both on the field and off of it; without such rules, the product could not exist. The antitrust implications of disciplinary sanctions in professional sports were confronted in *Molinas v. National Basketball Association*, 190 F.Supp. 241 (S.D.N.Y. 1961). Plaintiff, a star player, was suspended by the league for placing bets on league games. The court stated that "a disciplinary rule invoked against gambling

seems about as reasonable a rule as could be imagined." The court said that the rule was not only reasonable, "but [was] necessary for the survival of the league." 190 F.Supp. at 243. The anticompetitive effects of the disciplinary measure—which prohibited any NBA team from using the services of plaintiff—was absolute. No one could contract with plaintiff; no competition for his services in any respect was encouraged. The ban was total, complete, absolute, and purely anticompetitive. Were we to consider only these factors, however, in the manner done by the majority in this case with respect to the draft, we would be required to find that the disciplinary sanctions constituted a violation of the antitrust laws.

I would not agree with such a result, and I do not believe that *Engineers* requires it.

Widespread cheating would seriously jeopardize the marketability of the product of professional basketball. In a *Mitchel* sense, the prohibition of disciplinary sanctions in such cases would be disastrous to the League. I do not believe that *Engineers* was intended to overrule *Molinas*, or that congressional action is required to allow professional sports to effectuate such restraints. I would say that in the long run, the restraint in *Molinas* facilitates the survival of the League. It may ultimately encourage more competition; other Leagues, if the NBA grows, may form, or other sports leagues may develop and compete for the attraction of athletes and basketball fans. In my view, *Molinas* is indicative of the approach which should be used in this case.[58]

**58.** A case in which a similar approach was used is *Deeson v. Professional Golfers' Association*, 358 F.2d 165 (9th Cir.), *cert. denied*, 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (1966). In that case, plaintiff complained that the PGA and its members had combined and conspired to monopolize the business of tournament golf in violation of the Sherman Act. Deeson could not satisfy the requirements to become an approved tournament player, and he challenged the PGA entry rules on several grounds. The rules were restraints of trade: PGA members combined to keep out of the business those individuals who could not meet their standards. It was an absolute restraint on those with high scores, and there was no competition encouraged between members of the PGA who had met the requirements and those who could not. Yet the restraint did improve the quality of the product of tournament golf and in fact made the business of golf viable. That would have the ultimate effect of encouraging others to join the business; theoretically, those effects might encourage other golf associations to be established. The court in *Deeson* explained its approach in this way:

> It is true that generally speaking, any association that undertakes to sponsor a contest of any kind has power to exclude any applicant for any reason whatsoever, unless such power is curtailed by operation of law. The pertinent inquiry, however, is whether an association *intends to use that power in a manner which tends to suppress or destroy competition.*
>
> Mere size, unaccompanied by unlawful intent or conduct in the exercise of the power gained through size, does not constitute a violation of section 2 of the Sherman Act. . . . It is the existence of monopoly pow-

er *coupled with the intent to use it for anticompetitive purposes or with inevitable anticompetitive effects* that establishes the offense of monopolization. *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236.

> No finding nor evidence has been called to our attention which indicates that PGA *has used, or intends to use, its position* as the sponsor or co-sponsor of a substantial number of tournaments to preclude sponsorship of tournaments to others, to exclude golfers from access to PGA sponsored tournaments, or *to suppress or eliminate competition* in professional tournament golf.
>
> According to the evidence before us, PGA's creation of the category of approved tournament player *tends to promote competition by facilitating participation by proficient younger players.* According to the evidence, PGA has also sought *to stimulate competition* by giving official recognition to many tournaments which it neither sponsors nor co-sponsors. . . . we hold that the trial court did not err in finding and concluding that PGA did not use its power in a way which is violative of section 2 of the Sherman Act.

358 F.2d at 171 (emphasis added). Although the PGA rules, like the draft, absolutely prohibited competition at one level, the rules were viewed as an ultimate benefit to competition by ensuring the vitality of the product, as was the case in *Mitchel.*

*See also Hatley v. American Quarter Horse Association*, 552 F.2d 646, 654 (5th Cir. 1977) ("When the nature of the industry requires some limitations upon entrance, Section 2 is not violated").

## III. THE RULE OF REASON AND THE COLLEGE PLAYER DRAFT [59]

The district court grounded its decision in the application of the *per se* rule, but then went on to state that "even . . . application [of the Rule of Reason] would not save defendants from liability for the operation of the draft." [60] The court concluded that the evidence on whether the draft was essential to competitive balance was "at best equivocal," [61] and that no correlation was demonstrated between the draft and survival of the League and in reaching such conclusion ignored the uncontradicted *factual* testimony to the contrary in preference to an economist's "expert" *opinion* not based in factual evidence. [62] The court did not consider these matters in detail, however, as it believed that "the current structure is significantly more restrictive than necessary," [63] and thus the draft could not satisfy the Rule of Reason. The court said that the number of rounds could be restricted, or more than one team could be permitted to draft each player. [64] Although the majority utilize a slightly different approach, they affirm the conclusion of the district court.

The majority find that the draft is anticompetitive in its purpose (Maj. Op. at ——

of 193 U.S.App.D.C., at 1186 of 593 F.2d). It is true that the draft in an objective sense is intended to restrict the competition among teams for the services of the players. Clearly, this purpose is not "nefarious"; the draft is intended to promote the entire NFL, the quality of the product to be offered the public and to ensure the vitality of the game's existence at the professional level. But this purpose only exists at one level, or in one market—the "player-service" market, for this is the only market or level where the draft operates. As discussed above, an anticompetitive purpose, by itself, cannot be enough to disqualify a restraint under the antitrust laws, for then the restraint in *Mitchel* or *Chicago Board of Trade*, which in objective terms was clearly anticompetitive for the period of its duration, would never have passed muster.

At least in this case, the important consideration is the *effect* of the draft. The majority concludes that the draft strips the players of "any real bargaining power," lowers their salaries, and suppresses if not destroys competition for their services. Maj. Op. at —— of 193 U.S.App.D.C., at 1185 of 593 F.2d. I disagree. The majority opinion and the trial court only looked at

---

**59.** Part IV of this opinion concludes that even if the draft is a violation of the antitrust laws, Smith suffered no damages and the cases should be dismissed. It should be noted that a finding of no damages, if reached first, eliminates the need to test the validity of the draft for purposes of this case, as a finding of no damages effectively moots the antitrust violation issue involved. *See Kapp v. National Foodball League*, 586 F.2d 644 at 649 (9th Cir. 1978). *See also* text accompanying note 83 *infra* (finding of no antitrust violation effectively moots the damages issue).

**60.** 420 F.Supp. at 745.

**61.** 420 F.Supp. at 746.

**62.** 420 F.Supp. at 746. One "expert" for the plaintiff, which the majority principally relies on, testified that the draft "doesn't have *any effect* on . . . [competitive balance] . ." J.A. 910. He further testified that the talent gravitated to the "city where it is most valuable . . ." To his mind the *absence* of restrictions on redistributing talent among the teams "according to their value to the team"—the freedom that exists for talent to be moved after

the draft—resulted in the draft failing to have "any effect" on competitive balance. This testimony destroys the theory of plaintiff's case—that the draft "actually" compels the player to sign with the team that drafts him. In this respect, the testimony is correct, the draftee is not hide bound to the team that selects him, but the conclusion that the expert and the majority draw therefrom—that the draft does not have "any effect" on competitive balance—is incorrect. In the past players have not moved all that frequently and the testimony that the development of the strength of winning teams in the league was *based on the draft* (J.A. 1406 (Bengals); 1715 (Broncos); 1849 (Dallas)), indicates that the "experts'" opinion is unsupported by the factual testimony. Part of this argument also overlooks the fact that the movement of players from team to team most frequently involves trading players *and* draft choices. *Cf.* Maj. Op. n.46.

**63.** 420 F.Supp. at 746.

**64.** 420 F.Supp. at 747.

the draft from the players' side and only at a portion of that. As for bargaining power, the operation of the draft also restrains the team from dealing with other players (even though there are exceptions, discussed below). This is particularly true when a team drafts for a position, as the Redskins did in drafting Smith as their first round choice in 1968. The Redskins drafted Smith in the first round to fill a need at the "free safety position." In using their first round draft choice to select a player for that particular position, they practically put all of their eggs in one basket for that year. In selecting Smith, they passed over or did not reach, all other players of nearly equal ability for that position. After the Redskins had exercised their first draft selection, these other players would be chosen by other teams with later picks, and would thus not be available in later rounds. Even if another player was later available, it would be a waste of a valuable draft choice for the Redskins to use any subsequent choice to draft for that same position, since the position needed only one player and the team had other needs to fill as well. That is the way the 1968 player draft went for the Redskins. After they had drafted Smith first to fill that position, the team practically had to sign him if they wanted to fill what they considered was a vital team vacancy. These circumstances gave Smith very substantial bargaining leverage,[65] as his professional negotiating agent frequently reminded the Redskins. Also, a first round draft choice commands considerable publicity in the locality, and the team is under very considerable pressure from its fans to sign the player and thereby put the first-round pick in a uniform.[66] Smith was the beneficiary, as a first round choice, of such public pressure.

While in a free market a player could negotiate with several teams, a team could also negotiate with several players of nearly equal ability and play one off against the others. If Smith had negotiated with the Redskins in a free market, the Redskins could also have simultaneously negotiated with the next-best prospect for free safety as well and the availability of the other player might have served to reduce the salary offers to Smith. Then if Smith and the Redskins could not come to terms, the Redskins could always opt for one of the other prospects they considered to be close to Smith in ability, well realizing, as experience has many times proven, that the ultimate development and performance of the second or third choice might eventually eclipse that of their first favored choice.[67] Drafting college players is not an exact science.

Furthermore, the draft gives an advantage to the player in permitting him and his agent to know the approximate value that the team places on his services. This can be determined from the round in which he is selected in the draft and what his and other clubs are contracting to pay players of his relative ability at his position and draft status. As the testimony in the trial court disclosed, in a free market players would be at some disadvantage in negotiating a contract because they would not necessarily know in advance what value the team placed on their services. A player drafted in the first round obviously knows he is highly valued by the team, and he can use this expression of relative value to bargain for a higher salary accordingly.[68] In fact, the particular round in which a player is drafted, when coupled with the position he plays, has the practical effect of giving that player's services from year to year a definite monetary value.

Having this advance knowledge places a drafted player in a position of strength in his competitive bargaining with the team for his services and salary wise this considerably offsets the competitive disadvantage of being limited to one team. Indeed, this

**65.** J.A. 1171, 1622–23, 1631–33, 1848–56, 1869–70.

**66.** J.A. 1124, 1364–65, 1410–11, 1586–87, 1711–12.

**67.** J.A. 1496–97.

**68.** J.A. 1363–65, 1495–1500, 1887–89, 1926–28; see J.A. 1415.

fact, when coupled with the practical compulsion for the drafting team to sign their choice, particularly when a team drafts to fill a position, gives the negotiating player a very considerable advantage in bargaining for his salary.[69]

In any event, the restraint that actually results on the player from being restricted to bargaining with one team can be overestimated if one just reads the majority opinion and looks no further than the written word. Actually there are a number of league practices that alleviate what might appear to be the strict requirements of the draft. It is a "common practice" for a player to be drafted by one team, and then to deal with another team, followed by a trade between the club having the negotiating rights and the club wanting the player.[70] At oral argument, it was brought out that Jack Snow of Notre Dame was drafted as a wide receiver by the Minnesota Vikings in the first round.[71] However, Snow expressed a dislike for playing in the Minnesota climate, refused to negotiate with the

**69.** Though the weight of this factor should not be overestimated, it is true that a draftee can negotiate with clubs in the Canadian Football League, and use that negotiation as leverage in bargaining with NFL clubs. It is known by all football followers that Terry Metcalf, the premier running back with the St. Louis Cardinals in the 1977 season, has recently signed with a Canadian team. The existence of the Canadian option is entitled to some weight. *See* J.A. 1368–69, 1409–15, 1713–14, 2007.

**70.** J.A. 107, 1137, 1418. In one breath the majority opinion asserts that players cannot play with any team except those that draft them and in the next breath it asserts that a number of factors are "decisive in players' choice of teams . . ." such as: (1) unrelated business opportunities, (2) racial discrimination, (3) *general community atmosphere*, (4) preference for league, (5) dispute with owner, (6) climate, (7) educational opportunities, (8) disagreement with coaching staff, (9) disagreement with management. Maj. Op., p. —— of ·— U.S.App.D.C., at 1183 of 593 F.2d. And to this can be added a player's personal preference for a city or area in proximity to his residence or to the college where he played, and his possible objection to the quality (winning record or prospect thereof) of the team that drafted him. Each of these circumstances can be a factor in a player moving to a team after he has signed a contract and can more easily be a factor in his signing initially with some team other than the one that drafted him.

**71.** *Encyc.,* at 165.
The majority complains of reference to facts disclosed in the Encyclopedia of Pro Football and to matters of common knowledge that can be readily verified by reference to encyclopedias, books and other publications of established authenticity. This however is clearly permissible and may be done for the first time on appeal as is recognized by the Federal Rules of Evidence, Rule 201(f) which states: "Judicial notice may be taken at any stage of the proceedings." *See also Werk v. Parker,* 249 U.S. 130, 132–33, 39 S.Ct. 197, 63 L.Ed. 514 (1919);

*New York Indians v. United States,* 170 U.S. 1, 18 S.Ct. 531, 42 L.Ed.2d 927 (1898); *Landy v. FDIC,* 486 F.2d 139, 150–51 (3d Cir. 1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *Baenitz v. Ladd,* 124 U.S.App.D.C. 237, 238, 363 F.2d 969, 970 (1966); *Mills v. Denver Tramway Corp.,* 155 F.2d 808, 812 (10th Cir. 1946); *American Legion Post No. 90 v. First National Bank & Trust Co.,* 113 F.2d 868, 872 (2d Cir. 1940); *Nev.-Cal. Electric Securities Co. v. Imperial Irr. Dist.,* 85 F.2d 886, 905 (9th Cir. 1936), *cert. denied,* 300 U.S. 662, 57 S.Ct. 493, 81 L.Ed. 871 (1937); *Palmer v. Sun Oil Co.,* 78 F.Supp. 38, 53 (N.D.Ohio 1948); *De Cew v. Union Bag & Paper Co.,* 59 F.Supp. 301, 313 (D.N.J.1945); *Dunbar v. Humboldt Bay Municipal Water District,* 254 Cal.App.2d 480, 62 Cal.Rptr. 358, 361 (1967); 29 Am.Jur.2d *Evidence* § 16 at 56; 31 C.J.S. *Evidence* § 29 at 884–932. *In re Knapp-Monarch Co.,* 296 F.2d 230–232, 49 CCPA 779 (1961), states:
Judicial notice also may be taken of facts "though they are neither actually notorious nor bound to be judicially known, yet they would be capable of such instant and unquestionable demonstration, if desired, that no party would think of imposing a falsity on the tribunal in the face of an intelligent adversary." [Citing Wigmore on Evidence, Third Edition (1940), Vol. IX, Section 2571(3)].
It is a complete answer to the majority's complaint of the few references by this opinion to recent events, Maj. Op. at —— n. 49 of 193 U.S.App.D.C., at 1185 n.49 of 593 F.2d, that the majority does not question the *validity* of any of the facts so referred to. Actually, such recent facts are merely duplicative of facts already in the trial record. The invalidity of a court's prior factual assumptions that are predictive of future consequences may be demonstrated by pointing out that the results were different than was predicted; and the fact that some of these results occurred after the court's decision does not prevent their use. In fact, since the court indulged in predictive assumptions it invited testing by the subsequent outcome.

Vikings, and was traded to the Los Angeles Rams where he played eleven seasons, 1965 to 1975.[72] Joe Namath was also selected on a first round draft choice obtained in a player trade. Encyc., 184. It is common knowledge that teams frequently trade players to satisfy compelling personal preferences of the players.[73] So in practical reality the draft is not as restrictive as it may seem to those who are unfamiliar with it or who blind themselves to how it works in practice.

All teams recognize that player morale is an important factor in football.[74] The player draft is not a cold austere proceeding conducted by ruthless automatons who make their selections regardless of the desires of the players they select. To assure that players will be agreeable to playing for them the teams contact players they expect to draft in advance of the selection,[75] and try to avoid players who do not want to sign to play with them.[76] If the play of forces in the draft result in a situation where the player does not sign with the team that drafted him, a trade is generally worked out to some team where he will agree to sign.[77] The drafting team has every incentive to do this in order to salvage something out of their exercise of a valuable draft choice. Sometimes a team drafts a player with the intention of trading him for a veteran player with some other team. The draft works in many ways to achieve team balance. Generally players consider it an honor to have been drafted[78]; it is those who are not drafted who are disappointed.[79]

Simply because the draft is essential to the vitality of the business does not mean that players entering the League, as opposed to veterans already playing in the League, have no interest in the existence of a draft. It would be error to suggest otherwise because without a draft a less stable League with fewer franchises and lower salaries would result. Incoming players receive salaries and bonuses far in excess of what they could command in a free market of teams in a league that did not have the competitive balance which a player draft produces. The vitality of the League, which is admittedly dependent in large measure on the balanced team competition produced by the draft, has attracted so great a public interest that the public in most localities, as referred to above, has subsidized the teams by the erection of huge stadiums without full contribution to their cost by the teams that use them. This fact has enabled salaries paid to draftees to be higher than what they would be in a free market with the attendant destructive competition, unequal competitive balance, and resulting shaky franchises. It cannot be said that rookie players have no interest in the existence of the college player draft.

In short, in my opinion, the evidentiary record here supports the conclusion that the draft also has a favorable effect on the bargaining position of players, which to a considerable extent nets out the adverse effect it has in limiting the players' right to negotiate with other teams. And this bargaining equivalency vitiates the assertion that players' salaries are depressed on account of the draft.

As for suppressing competition for players' services, it is true that the draft, objectively speaking, restricts such competition between teams. But beyond that, the exist-

---

**72.** See *Encyc.*, at 159. The Vikings may have drafted Snow with the intention of trading for a Los Angeles player.

**73.** J.A. 1418, 1686–89; *Encyc.* at 164 (circumstances of trade of Fran Tarkenton in 1967 from Minnesota Vikings to New York Giants). See n.70, *supra*.

**74.** J.A. 1411.

**75.** J.A. 1409, 1410. This is not in violation of league rules as the majority might infer.

League rules only prohibit signing a player before all his college games have been played. J.A. 214, *cf.* 211–212.

**76.** J.A. 1137, 1410.

**77.** J.A. 1418.

**78.** J.A. 1453.

**79.** *Id.*

ence of the draft has a direct relationship to the vitality of the business in the *Mitchel* sense, which takes this draft out of the realm of "unreasonably restrictive" restraints. The majority asserts that improving competitive balance has no immediate effect on the market for players' services, and that the draft does not increase competition in the sense of encouraging others to enter the market. Maj. Op. at – – of 193 U.S.App.D.C., at 1186 of 593 F. 2d. Improving competitive balance may not have an immediate, direct effect in the market for players' services, but competitive balance is related to the quality of the product and the vitality of business and the production of the revenues that the player market expects for its services. And as league revenues have increased so have player salaries. While entry into the market of professional sports leagues is not particularly easy, that avenue is not absolutely blocked. And a successful league does provide an incentive for entry. In fact, since the draft was inaugurated in 1935 there have been 19 teams successfully added to the league—and a number of others tried. And for a considerable period of time there was inter-league competition for players' services. This is a very substantial procompetitive benefit in the *Mitchel* sense, and it is not taken into account by the majority in its balancing approach. Yet to the extent entry is assumed to be impossible, this only supports the contention that the business of professional football is a "natural monopoly" where carefully policed agreements, somewhat restrictive in themselves, are tolerated because they are essential to the vitality and existence of the business. Regardless of which track one's analysis takes, it does not follow that the draft violates the Rule of Reason.

In addition to enhancing the possibility of competition from other Leagues, it must be recognized that the NFL must compete with businesses and other careers for the best graduating college players in order to attract spectators to its games and a large audience to the television. In some instances, the NFL must even compete with other sports for the services of the same athletes. Since 1935, the draft has helped the NFL in this competition. Now, almost all of the best college players sign with professional teams, the attractiveness of the game has increased, baseball (according to some) has been supplanted as the national game, and teams' incomes and players' salaries have greatly increased—to astronomical amounts in some instances.

So viewed, the argument of the Redskins and the NFL here differs from that advanced in *Engineers*. It is true that the engineering profession argued that lifting the ban on competitive bidding would reduce the quality, durability, and safety of the product. But this was not found to be true and it had nothing to do with the *Mitchel* consideration of whether the ban was essential to the wholesome existence of the industry, or in the long run served to encourage competition for the provision of that product or comparable products. That is what is involved here when the matter of "competitive balance" is invoked; what was condemned in *Engineers* is not the same thing.

The majority, like the trial court, hints at, but does not assess the legality of, less restrictive alternatives. I have already indicated why I believe such alternatives would not fulfill the present purpose of the draft. In evaluating less restrictive alternatives as a matter of law, it is difficult to imagine what kind of draft would be valid if the existence of a less restrictive alternative would automatically render the present draft unreasonable. Some less restrictive alternative can always be imagined. When applying the Rule of Reason, the test is not whether the defendant used the least restrictive alternative. Rather, the issue, as explained above, is whether the restriction is "*unreasonably* restrictive" in the context of the particular case.[80] A reasonable restriction does not become illegal merely be-

---

80. *Bravman v. Bassett Furniture Industries, Inc.*, 552 F.2d 90, 102 (3d Cir.), *cert. denied*, 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977); *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1248–49 (3d Cir. 1975).

cause a less restrictive alternative exists. In my view, there is no proof in this record that a less restrictive draft can achieve the necessary benefits of the present draft in preserving the vitality of the business, as I have discussed that matter above, and thus just because some less restrictive alternatives might be conjured up is of no force. All the less restrictive alternatives result in free agents and these can be acquired to assure continued team dominance—not competitive equality. As the New York Yankees have proved, just one free agent added to a strong roster by a free spending owner can assure team dominance and deny it to another team.

In any event, it is not necessary for this court to prescribe what form the draft should take. And it will probably never be necessary to do so because it appears that the labor exemption may already have been used to validate a draft with less restraint than the one that existed in 1968 and there is no showing that the present draft damages the players. But there is no proof that the present draft, or one that might be hereafter negotiated, will be as beneficial to the players, by way of preserving the necessary competitive balance. The present momentum of the League's growth can continue for a considerable period, and perhaps for some time can survive changes in the draft that eventually will prove to be detrimental in the long run. But when making changes, they are tampering with the goose that continues to lay the golden egg; they should be careful lest they create problems for the future. Like it or not, there will always be some form of player draft because it is necessary to the success of the League. The aim is to have all teams as nearly as possible at roughly equal competitive strength and drawing power, and not to create problem franchises. Instead of imagining less restrictive alternatives courts should work to improve the draft to benefit the weaker teams. Hockey is losing its television attraction,[81] its lack of competitive balance is weakening and losing fran-

chises, and soccer is coming on strong. Whether television revenue would continue at its present astronomical figure if soccer became the national game as in most of the rest of the world is an open question. Certainly it would provide substantial competition for football if public interest shifted though the seasons are not parallel. These changing conditions indicate the need to avoid unwise changes in the draft which might harm the overall strength of the NFL. The draft is one of the most important methods by which weaker teams can improve themselves.[82]

Antitrust analysis must retain the flexibility to cope with the multiplicity of types of businesses and types of restraints that pervade our economic system. This is particularly true with boycotts, which is in essence the type of restraint that is involved with the college draft. Various kinds of concerted action must be distinguished, and treated in different ways. *Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), teaches that if a group of store owners in combination urge manufacturers to stop selling wholesale goods to the competition and if the group backs up its request by refusing to do business with the manufacturer, the restraint—the effect and purpose of which is to drive the competition out of business—is illegal *per se.* However, if a group of citizens in combination refuse to patronize the store, the restraint—the effect and purpose of which is to drive the store out of business, or cause it to sell different kinds of books—would not be deemed violative of the antitrust laws, even though it is very similar to the conduct condemned in *Klor's.* Courts recognize that citizen groups can restrain trade for non-economic purposes, even though the intent of the restraint—bringing economic sanctions to bear on the object of the boycott—is the same as other conduct deemed illegal.

The draft, in my view, fails somewhere in between the boycott condemned in *Klor's* and the boycott for a non-economic purpose.

81. J.A. 1760; *see* note 33 *supra.*

82. J.A. 1316.

The draft is designed to obtain an economic benefit—promoting the economic vitality of the League through competitive balance. But unlike both the *Klor's* and the citizen restraint, the benefit sought is *not at the expense of the object of the boycott, i. e.,* those veteran football players who play in the NFL. They profit enormously from it, and drafted rookies expect to and do as evidenced by the size of their salaries and bonuses. The economic benefit which is obtained by producing a viable product, league sport, inures to the benefit of those who are, at one time or another, the objects of the boycott, namely the players. This is a consideration which should not be taken lightly; it is endemic of the type of analysis which is within the realm of the *Mitchel* doctrine, as related in *Engineers.*

In short, I do not believe that *Engineers* requires that the draft as it existed in 1968 be struck down as violative of the Rule of Reason, and I would conclude that the 1968 draft was not unreasonable under the *Engineers'* standard.

Finally, the majority's reasoning should be noted that:

> [A] player draft can survive scrutiny under the rule of reason only if . . . at the least . . . it is demonstrated to accomplish legitimate business purposes and to have a net anticompetitive effect that is insubstantial.

Maj. Op. p. —— of 193 U.S.App.D.C., p. 1188 of 593 F.2d. The majority admit that the draft is not pernicious and that it *does* contribute to the accomplishment of a legitimate business purpose—the improvement of the. league product so all players and teams may benefit. All that remains is to find that the net anticompetitive effect is "insubstantial." If we find with the majority that there is no procompetitive effect then it is purely a question of evaluating

the anticompetitive effect of the draft. This brings us in this case to the effect of the draft on Smith's salary. Smith's salary was in line with those of other Redskins. J.A. 423–575. Since the financial records for 1968 indicate that the Redskins and the other league teams were paying out practically all their income in players' salaries and other operating costs it is obvious that, draft or no draft, Smith's chance of getting a higher salary was practically non-existent. Thus, the effect of the draft on him was *insubstantial* and under the majority's formulation the draft would survive. I would concur in that conclusion. It is merely another way of saying that Smith has no cause of action because he obtained as favorable a contract as he could even if there were no draft.

## IV. DAMAGES

If the draft does not violate the Rule of Reason, it is unnecessary to reach the question of the proper measurement of damages. However, assuming *arguendo* that the draft as it existed in 1968 was illegal, I would still conclude that Smith was not entitled to any recovery against defendants.[83] In my view, this is so clear that it is not necessary to remand to the district court for recomputation.

I agree with the majority that it was proper for the trial court in computing the damage award to include the disputed $19,800, which the Redskins paid Smith after his injury, in Smith's "actual compensation." I also agree with the majority that it was error for the district court to compute the damages based on the finding that Smith, if he had been negotiating in a free market, would have been able to negotiate a three-year contract with salary guaranteed regardless of injury. In my view, it was clearly erroneous for the trial court to conclude that Smith could have obtained

---

**83.** On August 4, 1978, the Ninth Circuit decided *Kapp v. National Football League,* 586 F.2d 644. One of the restraints attacked by Kapp was the college player draft. At 646. Because the court's holding on Kapp's challenge to the trial court's jury instructions had the effect of affirming the jury's verdict, which found that Kapp was not damaged by the "illegal re-

straint," at 647–648, the court did not reach the question raised by the NFL's cross-appeal whether the district court's holding that the various rules violated the antitrust laws was in error. By affirming the jury verdict, the court eliminated the possibility that the NFL might suffer; accordingly, the cross-appeal was declared moot and dismissed. At 649–650.

such a contract. No rookie in history had obtained such a contract. The Redskins had originally offered Smith a three-year contract, with a fourth-year option, at a beginning lesser salary of $17,500 but with regular annual increases. Smith and his agent had rejected such offer in favor of a one-year contract, and one additional option-year, at the higher $23,000 salary and a $5,000 performance inducement if he "made the squad." And a $22,000 signing bonus was added—total for 1 year—$50,000. The evidence shows that Smith did not want a three-year contract at a lesser salary, and it does not support a finding that a player in Smith's position, an unproven rookie, would be successful in obtaining a contract in which the compensation would be guaranteed for a three-year period.

However, I am unable to agree with the majority's affirmance of the district court's comparison with Pat Fischer to produce an annual salary of $54,000 for Smith if the antitrust violation had not occurred. The district court compared Smith with his teammate Pat Fischer, and based Smith's salary on that received by Fischer in 1968. In my opinion, for a number of reasons, equating Smith with Fischer for salary purposes was clearly erroneous, and I dissent from the majority's affirmance of that portion of the trial court's judgment.

The trial court is in error when it states that Fischer played the *same position* and the majority is in error when they find sufficient similarity to base his salary on the salary paid for Fischer's position which they term a "similar position." Maj.Op., p. ——, n.76 of 193 U.S.App.D.C. p. 1190, n.76 of 593 F.2d. The trial judge asserted "Fischer was recognized as an outstanding *defensive back (plaintiff's position)"* and that he was "looking at the compensation received by other *top players* in the league at that time, *particularly those playing his position* or with the Redskins." [84] The ma-

jority assert: "Pat Fischer, like plaintiff, was a *defensive back* who signed with the Redskins in 1968." Maj.Op. n.75. Actually, the men played different positions as the testimony indicated.[85] Smith was a "free safety," and Fischer was a "left cornerback."[86] Of course, defensive backs, like defensive linemen are all "similar" in some respects, but there are also great dissimilarities. Cornerback, as has been aptly stated is "the game's most demanding position."[87] Left cornerback is a far more difficult position in today's defenses than free safety, as it requires the player to cover eligible pass receivers over a greater area of the field (from the line of scrimmage to the limit of a passer's throwing ability), and the eligible receivers they are generally required to cover are usually the opponent's fleetest and best pass receivers. Cornerbacks also invariably have more passes thrown to the players they are assigned to cover. Saying that Smith and Fischer played the same position, *"defensive back,"* is almost as erroneous as saying that all *offensive backs* play the same position, or that all offensive linemen play the same position. But fullbacks are not the same as quarterbacks and wide ends are not the same as centers, or guards, etc. The wide differences between safety and cornerback may escape many television viewers because TV rarely shows a safety except just before a pass arrives in his playing area. Actually the positions are more like a running guard and the back guard in the early basketball game.

In addition, the facts with respect to Smith and Fischer, which teams take into consideration in determining salaries, are so different in material respects that it could not be reasonably concluded that Smith was the equivalent of Fischer. Smith was selected as an All-American player on defense at the University of Oregon, but in the 1968 draft he was still only a rookie with considerable promise, *untested* in professional

---

84. 420 F.Supp. at 747.

85. J.A. 1069.

86. *Id.*

87. The Complete Handbook of Pro Football, Hollander, p. 169 (Signet, 1976).

football. As one of plaintiff's own witnesses testified:

I think Pat Fischer had a record that he could stand behind and Yazoo [Jim Smith] still had something to prove in the NFL.

J.A. 1070. Fischer was a veteran cornerback in the NFL. He had played eight years with the St. Louis Cardinals, had been All-Pro twice, and had been selected as the "most valuable player" on the Cardinals. Fischer was a *proven* player and was qualified at a more difficult position to play. His total pass interceptions in the league was very impressive as would befit an All-Pro at cornerback. The trial court asserted that Smith played up to his advance billing as a free safety, but at oral argument it was admitted that Smith had not intercepted a single pass during the 1968 season. The testimony reflects that Smith was a good athlete and a fine prospect but, despite the undoubted promise that he demonstrated, when one considers that the leading passers averaged about 20 forward passes a game,[88] and Smith in ten leagues games playing a free safety position did not intercept even one pass out of roughly 200 passes, his actual league play does not indicate outstanding performance in the most important duty that his position required—covering forward passes.

By misinterpretation of the testimony, the trial court is also in error in flatly asserting that "*Commissioner Rozelle . . . determined that Fischer's services were not as valuable as those of . . . the plaintiff,* and instead awarded the Cardinals compensation consisting of the Redskins' second . . . and . . . third round draft [choices] . . . ."[89] Rather, it appears to me that the sense of Commissioner Rozelle's testimony was that he concluded that awarding the two draft choices was the most equitable solution because Smith was the Redskins' first round draft choice and such fact carried *a great deal of public relations value in the community.*[90]

Thus, for the variety of the above stated reasons, in my view, it was clearly erroneous for the district court to base Smith's salary computation on the assumption that he was comparable to Pat Fischer.

Even assuming that Smith was comparable to Fischer, when one takes into account that fact that Smith himself selected a one-year contract with a one-year option and the higher salary that goes with a shorter contract, instead of a three year contract, and that Smith as an untested rookie was unable to get more, it becomes clear that *Smith made a conscious choice and really suffered no damages.* Smith, under his contract, received $28,000 for making the squad and playing in 1968[91] and a signing bonus of $22,000, making his total compensation $50,000 for the first season. Fischer, who obtained a two-year contract, received a salary of $30,000 per year and a signing bonus of $48,000. When Fischer's salary is annualized, he received $54,000 for the 1968

88. *See Encyc.*, at 68.

89. 420 F.Supp. at 749.

90. The transcript shows:

Q [by Mr. Johnson]: And you felt that either Charley Taylor or his plaintiff were worth more than the [exclusive] right to Pat Fisher's [*sic*] services. Is that correct?

A [by Mr. Rozelle]: I did at that time, considering all the circumstances including the fact that Charley Taylor had already established himself with the Redskins and that Smith was the Redskins' first draft choice, which carried a great deal of public relations value in this community.

J.A. 135.

A. I just concluded on the basis of the review I could make at that time that considering the impasse between the two clubs, the most equitable solution in my judgment was a second and a third draft choice going from St. Louis rather than [Smith] going from Washington to St. Louis.

J.A. 141. A player's *value* when he is negotiating his contract and his value after he has been signed as a first-round draft choice are not the same. After he is signed, he reflects all the scouting costs that led to his acquisition and the contemporaneous publicity value to the team that flows from having signed one of its draft choices.

91. Smith was paid $23,000 in salary and was awarded a $5000 performance bonus if he "made the Redskins squad," as set forth in the contract. J.A. 837.

season.[92] At best, Fischer only received $4,000 more than Smith—and this does not take into account the fact that Smith was an untested rookie who was not the equivalent of the proven Fischer, nor does this take into account the fact that the Redskins paid Smith an additional $19,800, which is what he would have received in the *next* season had Smith played out his option. The Redskins had no obligation to make this payment to Smith. Thus, Smith actually received $69,800 for playing his first season. Notwithstanding the disparity in Smith's and Fischer's proven worth, Smith received substantially the same amount in 1968 as did Fischer if the $19,800 is ignored; taking that sum into account, Smith received substantially more. In my view such facts reflect an absence of damage to Smith.

I agree with the majority that the district court in determining damages should consider evidence of "free market conditions." However, I find that the evidence is overwhelming that Smith would not have received more absent a draft than he actually did receive with the draft in effect. The following table illustrates how the Redskins compared with the average of all NFL teams in certain financial categories in 1968:

| | Redskins (a) | All NFL Teams (b) (Average) |
|---|---|---|
| Gross Income (GI) | $3,964,035 | $3,550,624 |
| Players Salaries & Bonuses | 1,604,407 (40% of GI) | 1,369,422 (39% of GI) |
| Operating Income | 264,559 ( 7% of GI) | 320,422 ( 9% of GI) |
| Income Before Taxes | 132,279 (c) | 155,923 |
| Provision for Income Taxes | 66,139 (c) | 77,962 |
| Net Income | 66,139 (c) | 77,962 |

(a) J.A. 422.

(b) J.A. 617–18.

(c) The Redskins' operating statement did not include the amounts of these items. They are accordingly estimated, based on the average of the other NFL teams. This seems reasonable since the Redskins players' salaries exceed, and their operating income is less than, the average of all League teams.

These figures show that the Redskins had a larger gross income than the average team in the NFL and that they spent a larger percentage of that sum on salaries and bonuses for players than the average team in the NFL (40%, as opposed to 39%).[93] The comparative financial statements (*id.*) also demonstrate that if the NFL teams were to base their operations on the amount of their actual revenues, players' salaries with the Redskins, and on the average with the other league teams, in 1968 were just about as high as they could go. This was even more true of the Redskin club which spent a larger proportion of its gross revenue on players' salaries than the average NFL team. Practically all of the money that any reasonable person would expect was devoted to players' salaries and bonuses by the Redskins and by the average League

92. 420 F.Supp. at 748. Brig Owens was a veteran player who came to the Redskins in 1966 from Dallas. In 1968, he played strong safety on defense and received a salary of $21,000 and a $2,000 bonus. J.A. 1063–65. Jerry Smith, a pass-catching end, signed with the Redskins in 1965. He received a salary of $26,000 in 1968 and did not think that Smith should have received more. J.A. 1056. He was a witness for plaintiff.

93. J.A. 422, 617–18.

team. Thus, whether or not there was a free market for players' services would not appear to be of much significance, as there was not sufficient money available in 1968 to pay substantially more in players' salaries than the salaries and bonuses that were being paid. Even if the Redskins had devoted their entire remaining income before taxes to players' salaries, it would only have resulted in a small increase for each player. And Smith might have fared less well with a team that did not pay as much of its gross income to its players as did the Redskins. Plus, given the fact that the draft definitely contributes to the competitive balance of the teams, and hence enhances their gate receipts and TV income, in a free market, with its attendant lack of competitive balance, there would have been less money available for players' salaries if the experience of the NFL under the prior free market conditions is any criteria. If a free market is to be considered in assessing damages the court must necessarily appraise the reduced income that teams suffered when a free market existed. Under such circumstances, it is difficult to perceive how Smith suffered any damage by the contract his agent negotiated and which he signed.

Furthermore, there are additional reasons why the testimony in my view does not support the trial court's conclusion that salaries of players would necessarily "increase . . . in a free market situation."[94] As indicated above, while a free market might permit a player to play one team off against another in salary negotiations, the teams could also play one player off against one or several players that were considered to be of near-equal ability. The competition between teams for the players' services that might tend to increase salaries could be offset by the teams negotiating with several players at the same time and selecting what the team, everything considered, determined to be the best deal. While a free market, offers a wider choice to a player it also gives a great deal more mobility to a team in its player negotiations. This would tend to decrease salaries. Also, in "free-

market bargaining," players would not have the advantage of knowing, from the round they were selected in the draft, what relative value the team placed on their services. The absence of this bargaining factor would impair the bargaining position of Smith, and would work to his detriment. Thus a free market would not be the panacea for Smith and other players that the trial court envisioned.

Finally, it seems ironic that Smith attacks the system from which he has profited so greatly. As noted above, most of the teams, and indirectly the players, are being *subsidized* tremendously by the local communities which furnish the playing facilities for their games. If the teams were required to finance and build the huge stadiums in which they play and to pay local taxes thereon, the money for the players' salaries would be greatly reduced. Most of this has developed under the draft, and yet it is argued that a player is damaged by the absence of a free market. Under the free market for players' services, there were greatly lowered salaries, fewer teams, fewer jobs for players, smaller and fewer stadiums, shaky franchises, and far less public interest (which to the extent it existed showed a great preference for college football). During that period, a player might be lucky to go with a good team which would stay good or he might be unlucky to go with a bad team which would stay bad and perhaps fold. That is what the evidence shows. The NFL has been built to its present status since the draft was inaugurated and the existence of the draft was one of the features of NFL operations that encouraged the creation of new teams, as *Mitchel* suggested it might. So, in my view, Smith has not proved that he was materially damaged by the absence of the free market with its attendant evils, smaller stadiums, less stable teams, smaller crowds, fewer teams, and a less profitable television contract.

When all of these considerations are added together, even if there was an antitrust violation, I cannot agree that Smith was

---

**94.** 420 F.Supp. at 747.

damaged thereby. It is a mistake to ignore the history of the draft, the practical realities of its operation and the objective it has achieved and then through an overly restrictive interpretation apply a law that was intended for normal business enterprises to a sport with unique operating characteristics, and I do not find that the Supreme Court's decisions so require.

## V. CONCLUSION

In my view the draft as it existed in 1968 was not a violation of the Rule of Reason and therefore illegal under the Sherman Act. Even if it was, the record reflects that Smith was not damaged thereby, and that this is sufficiently clear to make a remand unnecessary.

In sum, I conclude, because of the unique nature of NFL football and the historical reasons that led to the inauguration of the draft, that the 1968 NFL college player draft is not unlawful under the antitrust laws. While graduating players are generally required—with exceptions—to sign with the team that drafts them, the teams by the nature of the game and the draft are also practically restricted to signing the players they have drafted, or else suffer the loss of very valuable draft choices. Also, in actual practice the draft allows players considerable mobility. Other considerations, discussed above, also indicate that the bargaining positions of graduating players, who are represented by agents in a great many instances, are not hampered. For these reasons, I believe that the draft is within the Rule of Reason as outlined in *Engineers*.

Even if the 1968 draft violated the antitrust laws, I do not believe that Smith was damaged by any "anticompetitive evil." The record reflects that in 1968 Smith, and other rookies, would not have obtained any larger salary in a free market because, as it was, team revenues were almost completely expended for players' salaries, bonuses, and other benefits, and for team operating expenses. Thus, there were insufficient team assets for a free market to produce any larger salaries. The preponderance of the evidence also indicates that under a free market a few teams owned by wealthy individuals and having other special advantages would benefit to the exclusion of other teams—and thus destroy the competitive balance that is vital to the overall strength and revenues of the League. I also conclude that it was clearly erroneous for the district court in its salary computation to compare Smith with Fischer because they were both "defensive backs" when they played the substantially different positions of "free safety" and "cornerback." I would therefore reverse the judgment of the district court and order the case dismissed. To that end I respectfully dissent.[95]

---

**95.** The necessity of a draft of players in a league expansion was nowhere raised or discussed at trial or on appeal.